### Ex parte Clarke.

1. An officer of election, at an election for a representative to Congress in the city of Cincinnati, was convicted of a misdemeanor in the Circuit Court of the United States, under sect. 5515 of the Revised Statutes, for a violation of the law of Ohio, in not conveying the ballot-box, after it had been sealed up and delivered to him for that purpose, to the county clerk, and for allowing it to be broken open. *Held*, according to the decision in *Ex parte Siebold* (*supra*, p. 371), that Congress had power to pass the law under which the conviction was had, and that the Circuit Court had jurisdiction of the offence.

2. In such a case, a *habeas corpus* for discharge from imprisonment under the conviction was rightfully issued by a justice of this court, returnable before himself; and he had the right, if it could be done without injury to the prisoner, to refer the matter to this court for its determination, it being a case which involved the exercise of appellate jurisdiction.

3. Had the case involved original jurisdiction only, this court could not have taken jurisdiction of it.

PETITION for writ of *habeas corpus.*

The facts are stated in the opinion of the court.

*Mr. George Hoadly* and *Mr. Richard T. Merrick* for the petitioner.

*The Attorney-General* and *Mr. Assistant Attorney-General Smith, contra.*

MR. JUSTICE BRADLEY delivered the opinion of the court.

This case comes before us on the return to a writ of *habeas corpus,* issued by order of one of the justices of this court. The petition for a *habeas corpus* was addressed to the judges of the Supreme Court of the United States by Augustus F. Clarke, who states therein that he is a member of the city council of Cincinnati, and, as such, one of the judges of election of precinct A in said city; in which capacity he acted at the State, congressional, county, and municipal elections held in said city in October, 1878. That on the 24th of October, 1878, he was indicted in the Circuit Court of the United States for the Southern District of Ohio for unlawfully neglecting to perform the duty required of him as such judge of election by the laws of the State of Ohio in regard to said election, in this, that having accepted one of the poll-books of said election, sealed and directed according to law, for the purpose of conveying the same to the clerk of the Court of Common Pleas of Hamilton County, in said State, at his office, he neglected to do so; and, in another count, that he permitted the said poll-books, sealed and directed for the purpose aforesaid, to be broken open before he conveyed the same to said clerk; that a motion to quash said indictment, and a demurrer thereto, having been successively overruled, he pleaded not guilty, and at the February Term, 1879, was tried and found guilty; and having unsuccessfully moved for a new trial, and in arrest of judgment, he was sentenced by said court to be imprisoned in the jail of Hamilton County for twelve months, and to pay a fine of $200 and the cost of prosecution; that in pursuance of said sentence he had been arrested and imprisoned, and is now imprisoned and restrained from his liberty by the marshal of the United States for said district. The petition then asserts that the said Circuit Court had no jurisdiction in the premises, and

that its acts were wholly void and his imprisonment unlawful. He, therefore, prays a *habeas corpus* to the said marshal, and a *certiorari* to the clerk of said court, if necessary, and that he may be discharged from custody. A certified copy of the indictment, proceedings, and judgment in the Circuit Court is annexed to the petition, from which it appears that the first count charged that the petitioner on the 9th of October, 1878, in the county of Hamilton, in the State of Ohio, being an officer of election at which a representative in Congress was voted for, to wit, a judge of said election at precinct A of the eighth ward of Cincinnati, and being duly appointed such judge of election under the laws of Ohio, did unlawfully neglect to perform a duty required of him by the laws of said State in regard to said election, specifying said neglect, to wit, that he neglected to convey the poll-book to the county clerk, which had been sealed up by the judges and delivered to him for that purpose ; contrary to the form of the statute and against the peace and dignity of the United States. The second count charged that the petitioner, as such judge of election, violated a duty required of him by the laws of said State in regard to said election, specifying the violation, namely, that having received the poll-book in the manner and for the purpose aforesaid, he permitted it to be broken open before he conveyed it to the county clerk, contrary to the form of the statute, &c.

It is conceded that this indictment was found under sect. 5515 of the Revised Statutes of the United States, which is in the following words : [This section is set forth in *Ex parte Siebold, supra,* pp. 371, 381.]

The law of Ohio which the petitioner is charged with violating is as follows : —

" (32.) Sect. XIX. That, after canvassing the votes in the manner aforesaid, the judges, before they disperse, shall put under cover one of the poll-books, seal the same, and direct it to the clerk of the Court of Common Pleas of the county wherein the return is to be made; and the poll-book, thus sealed and directed, shall be conveyed by one of the judges (to be determined by lot if they cannot agree otherwise) to the clerk of the Court of Common Pleas of the county, at his office, within two days from the day of the

election; and the other poll-book, where the same is not otherwise disposed of by this act, shall be deposited with the township clerk, or clerk of the election district (as the case may be), within three days from the day of election, there to remain for the use of the persons who may choose to inspect the same."

On the thirty-first day of July, 1879, the said petition was presented to Mr. Justice Strong, and a writ of *habeas corpus* was allowed by him, returnable forthwith before himself, at the Catskill Mountain House, in the State of New York. On the 11th of August, 1879, return being made of the body of the petitioner according to the command of the writ, with a copy of the judgment of the Circuit Court, and the warrant of commitment issued thereon, Justice Strong made an order postponing the hearing of the cause into this court, to be heard upon the second Tuesday of October, 1879 (being the first day of the present term), and admitted the petitioner to bail in the sum of $5,000 to abide the rule of the Supreme Court in the premises.

The case was argued at the same time with *Ex parte Siebold*, *supra*, p. 371; and most of the questions involved have been considered in that case.

One question, however, has been raised by the counsel for the government which it is necessary to consider. It is objected that this court cannot proceed upon a writ of *habeas corpus* which was originally presented to a justice of this court, and was postponed and referred by him to the court for its determination.

We have considered this point with some care, inasmuch as in *Kaine's Case*, reported in 14 How. 103, the court held that it could not act upon a writ thus referred to it by Mr. Justice Nelson. But the ground taken there was, that the writ had been issued by him in virtue of his original jurisdiction; though the court was of opinion that it could issue a new writ upon the papers before it in virtue of its own appellate jurisdiction, and would do so if the case required it; but being of opinion that there was no case on the merits the application was discharged. But in this case, however it may have been in that, it is clear that the writ, whether acted upon by the justice who issued it, or by this court, would in fact require a

revision of the action of the Circuit Court by which the petitioner was committed, and such revision would necessarily be appellate in its character. This appellate character of the proceeding attaches to a large portion of cases on *habeas corpus*, whether issued by a single judge or by a court. The presence of this feature in the case was no objection to the issue of the writ by the associate justice, and is essential to the jurisdiction of this court. The justice who issued it could undoubtedly have disposed of the case himself, though not, at the time, within his own circuit. A justice of this court can exercise the power of issuing the writ of *habeas corpus* in any part of the United States where he happens to be. But as the case is one of which this court also has jurisdiction, if the justice who issued the writ found the questions involved to be of great moment and difficulty, and could postpone the case here for consideration of the whole court without injury to the petitioner, we see no good reason why he should not have taken this course, as he did. It had merely the effect of making the application for a discharge one addressed to the court, instead of one addressed to a single justice. This has always been the practice of English judges in cases of great consequence and difficulty, and we do not see why it may not be done here. Under the Habeas Corpus Act, indeed, it was the regular course to take bail and recognize the party to appear in the King's Bench or assizes; though the judge would discharge absolutely if the case was clearly one of illegal imprisonment. Hab. Corp. Act, sect. 3; Com. Dig., Hab. Corp. F.; Bac. Abr., Hab. Corp. B. 13; 1 Chitty, Gen. Pr. 685–688. Of course, under our system, no justice will needlessly refer a case to the court when he can decide it satisfactorily to himself, and will not do so in any case in which injury will be thereby incurred by the petitioner. No injury can be complained of in this case, since the petitioner was allowed to go at large on reasonable bail.

As to the merits of the case, there can be no serious question that the indictment charges an offence specified in the act of Congress. Rev. Stat., sect. 5515. Any defect of form in making the charge would be at most an error, of which this court could not take cognizance on *habeas corpus*. The prin-

cipal question is, whether Congress had constitutional power to enact a law for punishing a State officer of election for the violation of his duty under a State statute in reference to an election of a representative to Congress. As this question has been fully considered in the previous case, it is unnecessary to add any thing further on the subject. Our opinion is, that Congress had constitutional power to enact the law; and that the cause of commitment was lawful and sufficient.

The petitioner, therefore, must be remanded to the custody of the marshal for the Southern District of Ohio; and it is

*So ordered.*

MR. JUSTICE FIELD, with whom concurred MR. JUSTICE CLIFFORD, dissenting.

I cannot assent to the decision of the majority of the court in this and the preceding case, and I will state the reasons of my dissent. One of the six petitioners is a citizen of Ohio, and the other five are citizens of Maryland. They all seek a discharge from imprisonment imposed by judgments of Federal courts for alleged official misconduct as judges of election in their respective States.

At an election held in the first congressional district of Ohio, in October, 1878, at which a representative in Congress was voted for, the petitioner from that State was appointed under its laws, and acted as a judge of election at a precinct in one of the wards of the city of Cincinnati. At an election held in the fourth and fifth congressional districts of Maryland, in November, 1878, at which a representative in Congress was voted for, the petitioners from that State were appointed under its laws, and acted as judges of election at different precincts in the wards of the city of Baltimore. For alleged misconduct as such officers of election the petitioners were indicted in the Circuit Courts of the United States for their respective districts, tried, convicted, and sentenced to imprisonment for twelve months, and, in some of the cases, also to pay a fine.

In what I have to say I shall confine myself principally to the case of the petitioner from Ohio; the other cases will be incidentally considered. In that case, the petitioner is charged with having violated a law of the State. In the cases from

Maryland, the petitioners are charged with having prevented Federal officers from interfering with them and supervising their action in the execution of the laws of the State. The principle which governs one will dispose of all of them; for if Congress cannot punish an officer of a State for the manner in which he discharges his duties under her laws, it cannot subject him to the supervision and control of others in the performance of such duties, and punish him for resisting their interference. In the cases from Maryland, it appears that the laws of the State under which the petitioners were appointed judges of election, and the registration of voters for the election of 1878 was made, were not in existence when the act of Congress was passed providing for the appointment of supervisors to examine the registration and scrutinize the lists, and of special deputy marshals to aid and protect them. The act of Congress was passed in 1871, and republished in the Revised Statutes, which are declaratory of the law in force, Dec. 1, 1873. The law of Maryland, under which the registration of voters was had, was enacted in 1874, and the law under which the judges of election were appointed was enacted in 1876, and these judges were required to possess different qualifications from those required of judges of election in 1871 and 1873.

In all the cases the petitioners are imprisoned under the judgments against them; and each one insisting that the Circuit Court, in his case, acted without jurisdiction, and that his imprisonment is, therefore, unlawful and subversive of his rights as a citizen, has petitioned this court for a writ of *habeas corpus*, annexing to his petition a transcript of the record of the proceedings against him; and prays that he may be released from restraint.

It has been settled by this court that the writ of *habeas corpus* is one of the modes by which its appellate jurisdiction will be exercised in cases where it is alleged that by the action of an inferior tribunal a citizen of the United States has been unlawfully deprived of his personal liberty; and, if necessary, that a *certiorari* will be issued with the writ to bring up for examination the record of the proceedings of the inferior tribunal. In such cases, we look into that record to see, not whether the court erred in its rulings, but whether it had

jurisdiction to impose the imprisonment complained of. If it had jurisdiction, our examination ends, and the case must await determination in the ordinary course of procedure on writ of error or appeal, should the case be one which can thus be brought under our review. But if the court below was without jurisdiction of the matter upon which the judgment of imprisonment was rendered, or if it exceeded its jurisdiction in the extent of the imprisonment imposed, this court will interfere and discharge the petitioner. If, therefore, the act of Congress, in seeking to impose a punishment upon a State officer in one of these cases for disobeying a law of the State, and in the other cases for resisting the interference of Federal officials with the discharge of his duties under such law, is unconstitutional and void, the judgments of the circuit courts are unlawful and the petitioners should be released.

I do not regard the presentation by the petitioner from Ohio of his petition to one of the justices of the court in the first instance as a fact at all affecting his case. His petition is addressed to this court, and though the justice, who allowed the writ, directed that it should be returnable before himself, he afterwards ordered the hearing upon it to be had before this court. The petition may, therefore, with propriety be treated as if presented to us in the first instance. Irregularities in that regard should not be allowed to defeat its purpose, the writ being designed for the security of the personal liberty of the citizen.

The act of Congress upon which the indictment of the petitioner from Ohio was founded is contained in sect. 5515 of the Revised Statutes, which declares that " every officer of an election, at which any representative or delegate in Congress is voted for, whether such officer of election be appointed or created by or under any law or authority of the United States, or by or under any State, territorial, district, or municipal law or authority, who neglects or refuses to perform any duty in regard to such election required of him by any law of the United States, or of any State or Territory thereof; or who violates any duty so imposed; or who knowingly does any acts thereby unauthorized with intent to affect any such election or the result thereof, . . . shall be punished as prescribed " in a

previous section, that is, by a fine not exceeding $1,000, or imprisonment not more than one year, or by both.

The indictment contains three counts, the third of which was abandoned. The first count charges unlawful neglect on the part of the accused to perform a duty required of him by the laws of the State, in not carrying to the clerk of the Court of Common Pleas one of the poll-books of the election, covered and sealed by the judges of election, with which he was intrusted by them for that purpose. The second count charges the violation of a duty required of him by the laws of the State in permitting one of the poll-books, covered and sealed, intrusted to him by the judges of election to carry to the clerk of the Court of Common Pleas, to be broken open before he conveyed it to that officer.

The law of Ohio, to which reference is had in the indictment, provides that after the votes at an election are canvassed "the judges, before they disperse, shall put under cover one of the poll-books, seal the same, and direct it to the clerk of the Court of Common Pleas of the county wherein the return is to be made; and the poll-book thus sealed and directed, shall be conveyed by one of the judges (to be determined by lot if they cannot agree otherwise), to the clerk of the Court of Common Pleas of the county, at his office, within two days from the day of the election."

The provisions of the act of Congress relating to the appointment of supervisors of election, the powers with which they are intrusted, and the aid to be rendered them by marshals and special deputy marshals, for resisting and interfering with whom the petitioners from Maryland have been condemned and are imprisoned, are stated in the opinion of the court. It is sufficient to observe that they authorize the supervisors to supervise the action of the State officers from the registration of voters down to the close of the polls on the day of election; require the marshals to aid and protect them, and provide for the appointment of special deputy marshals in towns and cities of over twenty thousand inhabitants; and they invest those Federal officers with a power to arrest and take into custody persons without process more extended than has ever before in our country in time of peace been intrusted to any one.

In what I have to say I shall endeavor to show; 1st, that it is not competent for Congress to punish a State officer for the manner in which he discharges duties imposed upon him by the laws of the State, or to subject him in the performance of such duties to the supervision and control of others, and punish him for resisting their interference; and, 2d, that it is not competent for Congress to make the exercise of its punitive power dependent upon the legislation of the States.

There is no doubt that Congress may adopt a law of a State, but in that case the adopted law must be enforced as a law of the United States. Here there is no pretence of such adoption. In the case from Ohio it is for the violation of a State law, not a law of the United States, that the indictment was found. The judicial power of the United States does not extend to a case of that kind. The Constitution defines and limits that power. It declares that it shall extend to cases in law and equity arising under the Constitution, the laws of the United States, and treaties made under their authority; to cases affecting ambassadors, other public ministers and consuls; to cases of admiralty and maritime jurisdiction, and to various controversies to which the United States or a State is a party, or between citizens of different States, or citizens of the same State claiming lands under grants of different States, or between citizens of a State and any foreign State, citizens or subjects. The term "controversies" as here used refers to such only as are of a civil as distinguished from those of a criminal nature. The judicial power thus defined may be applied to new cases as they arise under the Constitution and laws of the United States, but it cannot be enlarged by Congress so as to embrace cases not enumerated in the Constitution. It has been so held by this court from the earliest period. It was so adjudged in 1803 in *Marbury* v. *Madison*, and the adjudication has been affirmed in numerous instances since. This limitation upon Congress would seem to be conclusive of the case from Ohio. To authorize a criminal prosecution in the Federal courts for an offence against a law of a State is to extend the judicial power of the United States to a case not arising under the Constitution or laws of the United States.

But there is another view of this subject which is equally conclusive against the jurisdiction of the Federal court. The act of Congress asserts a power inconsistent with, and destructive of, the independence of the States. The right to control their own officers, to prescribe the duties they shall perform, without the supervision or interference of any other authority, and the penalties to which they shall be subjected for a violation of duty is essential to that independence. If the Federal government can punish a violation of the laws of the State, it may punish obedience to them, and graduate the punishment according to its own judgment of their propriety and wisdom. It may thus exercise a control over the legislation of the States subversive of all their reserved rights. However large the powers conferred upon the government formed by the Constitution, and however numerous its restraints, the right to enforce their own laws by such sanctions as they may deem appropriate is left, where it was originally, with the States. It is a right which has never been surrendered. Indeed a State could not be considered as independent in any matter, with respect to which its officers, in the discharge of their duties, could be subjected to punishment by any external authority; nor in which its officers, in the execution of its laws, could be subject to the supervision and interference of others.

The invalidity of coercive measures by the United States, to compel an officer of a State to perform a duty imposed upon him by a law of Congress, is asserted in explicit terms in the case of *The Commonwealth of Kentucky* v. *Dennison*, 24 How. 66. The Constitution declares that " a person charged in any State with treason, felony, or other crime, who shall flee from justice, and be found in another State, shall, on demand of the executive authority of the State from which he fled, be delivered up to be removed to the State having jurisdiction of the crime." And the act of Congress of 1793, to give effect to this clause, made it the duty of the executive authority of the State, upon the demand mentioned, and the production of a properly authenticated copy of the indictment or affidavit charging the person demanded with the commission of treason, felony, or other crime, to surrender the fugitive. The Governor of Ohio having refused upon a proper demand to sur-

render a fugitive from justice from Kentucky, the Governor of the latter State applied to this court for a *mandamus* to compel the performance of that duty. But the court, after observing that, though the words, "it shall be the duty," in ordinary legislation implied the assertion of the power to command and to cause obedience, said, that looking to the subject-matter of the law and "the relations which the United States and the several States bear to each other," it was of opinion that the words were not used as mandatory and compulsory, but as declaratory of the moral duty created, when Congress had provided the mode of carrying the provision into execution. "The act does not provide," the court added, "any means to compel the execution of this duty, nor inflict any punishment for neglect or refusal on the part of the executive of the State; nor is there any clause or provision in the Constitution which arms the government of the United States with this power. Indeed, such a power would place every State under the control and dominion of the general government, even in the administration of its internal concerns and reserved rights. And we think it clear that the Federal government, under the Constitution, has no power to impose on a State officer, as such, any duty whatever, and compel him to perform it; for if it possessed this power it might overload the officer with duties which would fill up all his time, and disable him from performing his obligations to the State and might impose on him duties of a character incompatible with the rank and dignity to which he was elevated by the State. It is true that Congress may authorize a particular State officer to perform a particular duty; but if he declines to do so, it does not follow that he may be coerced or punished for his refusal. And we are very far from supposing that in using this word 'duty,' the statesmen who framed and passed the law, or the President who approved and signed it, intended to exercise a coercive power over State officers not warranted by the Constitution." And again: "If the Governor of Ohio refuses to discharge this duty, there is no power delegated to the general government, either through the judicial department or any other department, to use any coercive means to compel him."

If it be incompetent for the Federal government to enforce by coercive measures the performance of a plain duty, imposed by a law of Congress upon the executive officer of a State, it would seem to be equally incompetent for it to enforce by similar measures the performance of a duty imposed upon him by a law of a State. If Congress cannot impose upon a State officer, as such, the performance of any duty, it would seem logically to follow that it cannot subject him to punishment for the neglect of such duties as the State may impose. It cannot punish for the non-performance of a duty which it cannot prescribe. It is a contradiction in terms to say that it can inflict punishment for disobedience to an act the performance of which it has no constitutional power to command.

I am not aware that the doctrine of this case, which is so essential to the harmonious working of the State and Federal governments, has ever been qualified or departed from by this court, until the recent decisions in the Virginia cases, of which I shall presently speak. It is true that, at an early period in the history of the government, laws were passed by Congress, authorizing State courts to entertain jurisdiction of proceedings by the United States, to enforce penalties and forfeitures under the revenue laws, and to hear allegations, and take proofs, if application were made for their remission. To these laws reference is made in the Kentucky case; and the court observes that the powers which they conferred were for some years exercised by the State tribunals, without objection, until, in some of the States, their exercise was declined, because it interfered with and retarded the performance of duties which properly belonged to them as State courts, and in other States because doubts arose as to the power of State courts to inflict penalties and forfeitures for offences against the general government, unless specially authorized to do so by the States; and that the co-operation of the States in thoses cases was a matter of comity which the several sovereignties extended to one another for their mutual benefit, and was not regarded by either party as an obligation imposed by the Constitution.

It is to be observed that, by the Constitution, the demand for the surrender of a fugitive is to be made by the executive authority of the State from which he has fled; but it is not

declared upon whom the demand shall be made. That was left to be determined by Congress; and it provided that the demand should be made upon the executive of the State where the fugitive was found. It might have employed its own agents, as in the enforcement of the fugitive-slave law, and compelled them to act. But, in both cases, if it employed the officers of the State, it could not restrain nor coerce them.

Whenever, therefore, the Federal government, instead of acting through its own officers, seeks to accomplish its purposes through the agency of officers of the States, it must accept the agency with the conditions upon which the officers are permitted to act. For example, the Constitution invests Congress with the " power to establish a uniform rule of naturalization ; " and this power, from its nature, is exclusive. A concurrent power in the States would prevent the uniformity of regulations required on the subject. *Chirac* v. *Chirac*, 2 Wheat. 259; The Federalist, No. 42. Yet Congress, in legislating under this power, has authorized courts of record of the States to receive declarations under oath by aliens of their intention to become citizens, and to admit them to citizenship, after a limited period of residence, upon satisfactory proof as to character and attachment to the Constitution. But, when Congress prescribed the conditions and proof upon which aliens might, by the action of the State courts, become citizens, its power ended. It could not coerce the State courts to hold sessions for such applications, nor fix the time when they should hear the applicants, nor the manner in which they should administer the required oaths, nor regulate in any way their procedure. It could not compel them to act by *mandamus* from its own tribunals, nor subject their judges to criminal prosecution for their non-action. It could accept the agency of those courts only upon such terms as the States should prescribe. The same thing is true in all cases where the agency of State officers is used ; and this doctrine applies with special force to judges of elections, at which numerous State officers are chosen at the same time with representatives to Congress. So far as the election of State officers and the registration of voters for their election are concerned, the Federal government has confessedly no authority to interfere. And yet the super-

vision of and interference with the State regulations, sanctioned by the act of Congress, when representatives to Congress are voted for, amount practically to a supervision of and an interference with the election of State officers, and constitute a plain encroachment upon the rights of the States, which is well calculated to create irritation towards the Federal government, and disturb the harmony that all good and patriotic men should desire to exist between it and the State governments.

It was the purpose of the framers of the Constitution to create a government which could enforce its own laws, through its own officers and tribunals, without reliance upon those of the States, and thus avoid the principal defect of the government of the confederation, and they fully accomplished their purpose ; for, as said by Chief Justice Marshall, in the *McCullough Case*, " No trace is to be found in the Constitution of an intention to create a dependence of the Federal government on the governments of the States for the execution of the great powers assigned to it. Its means are adequate to its ends ; and on those means alone was it expected to rely for the accomplishment of its ends." When, therefore, the Federal government desires to compel by coercive measures and punitive sanctions the performance of any duties devolved upon it by the Constitution, it must appoint its own officers and agents, upon whom its power can be exerted. If it sees fit to intrust the performance of such duties to officers of a State, it must take their agency, as already stated, upon the conditions which the State may impose. The co-operative scheme to which the majority of the court give their sanction, by which the general government may create one condition and the States another, and each make up for and supplement the omissions or defects in the legislation of the other, touching the same subject, with its separate penalties for the same offence, and thus produce a harmonious mosaic of statutory regulation, does not appear to have struck the great jurist as a feature in our system of government or one that had been sanctioned by its founders.

It is true that, since the recent amendments of the Constitution, there has been legislation by Congress asserting, as in the instance before us. a direct control over State officers, which

previously was never supposed to be compatible with the independent existence of the States in their reserved powers. Much of that legislation has yet to be brought to the test of judicial examination; and, until the recent decisions in the Virginia cases, I could not have believed that the former carefully considered and repeated judgments of this court upon provisions of the Constitution, and upon the general character and purposes of that instrument, would have been disregarded and overruled. These decisions do indeed, in my judgment, constitute a new departure. They give to the Federal government the power to strip the States of the right to vindicate their authority in their own courts against a violator of their laws, when the transgressor happens to be an officer of the United States, or alleges that he is denied or cannot enforce some right under their laws. And they assert for the Federal government a power to subject a judicial officer of a State to punishment for the manner in which he discharges his duties under her laws. The power to punish at all existing, the nature and extent of the punishment must depend upon the will of Congress, and may be carried to a removal from office. In my judgment, — and I say it without intending any disrespect to my associates, — no such advance has ever before been made toward the conversion of our Federal system into a consolidated and centralized government. I cannot think that those who framed and advocated, and the States which adopted the amendments, contemplated any such fundamental change in our theory of government as those decisions indicate. Prohibitions against legislation on particular subjects previously existed, — as, for instance, against passing a bill of attainder and an *ex post facto* law, or a law impairing the obligation of contracts; and, in enforcing those prohibitions, it was never supposed that criminal prosecutions could be authorized against members of the State legislature for passing the prohibited laws, or against members of the State judiciary for sustaining them, or against executive officers for enforcing the judicial determinations. Enactments prescribing such prosecutions would have given a fatal blow to the independence and autonomy of the States. So, of all or nearly all the prohibitions of the recent amendments, the same doctrine may be

asserted. In few instances could legislation by Congress be deemed appropriate for their enforcement, which should provide for the annulment of prohibited laws in any other way than through the instrumentality of an appeal to the judiciary, when they impinged upon the rights of parties. If in any instance there could be such legislation authorizing a criminal prosecution for disregarding a prohibition, that legislation should define the offence and declare the punishment, and not invade the independent action of the different departments of the State governments within their appropriate spheres. Legislation by Congress can neither be necessary nor appropriate which would subject to criminal prosecution State officers for the performance of duties prescribed by State laws, not having for their object the forcible subversion of the government.

The clause of the Constitution, upon which reliance was placed by counsel, on the argument, for the legislation in question, does not, as it seems to me, give the slightest support to it. That clause declares that " the times, places, and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof; but the Congress may, at any time, by law, make or alter such regulations, except as to the places of choosing senators." The power of Congress thus conferred is either to alter the regulations prescribed by the State or to make new ones; the alteration or new creation embracing every particular of time, place, and manner, except the place of choosing senators. But in neither mode nor in any respect has Congress interfered with the regulations prescribed by the legislature of Ohio, or with those prescribed by the legislature of Maryland. It has not altered them, nor made new ones. It has simply provided for the appointment of officers to supervise the execution of the State laws, and of marshals to aid and protect them in such supervision, and has added a new penalty for disobeying those laws. This is not enforcing an altered or a new regulation. Whatever Congress may properly do touching the regulations, one of two things must follow; either the altered or the new regulation remains a State law, or it becomes a law of Congress. If it remain a State law, it must, like other laws of the State,

be enforced, through its instrumentalities and agencies, and with the penalties which it may see fit to prescribe, and without the supervision or interference of Federal officials. If, on the other hand, it become a law of Congress, it must be carried into execution by such officers and with such sanctions as Congress may designate. But as Congress has not altered the regulations for the election of representatives prescribed by the legislature of Ohio or of Maryland, either as to time, place, or manner, nor adopted any regulations of its own, there is nothing for the Federal government to enforce on the subject. The general authority of Congress to pass all laws necessary to carry into execution its granted powers, supposes some attempt to exercise those powers. There must, therefore, be some regulations made by Congress, either by altering those prescribed by the State, or by adopting entirely new ones, as to the times, places, and manner of holding elections for representatives, before any incidental powers can be invoked to compel obedience to them. In other words, the implied power cannot be invoked until some exercise of the express power is attempted, and then only to aid its execution. There is no express power in Congress to enforce State laws by imposing penalties for disobedience to them; its punitive power is only implied as a necessary or proper means of enforcing its own laws; nor is there any power delegated to it to supervise the execution by State officers of State laws.

If this view be correct, there is no power in Congress, independently of all other considerations, to authorize the appointment of supervisors and other officers to superintend and interfere with the election of representatives under the laws of Ohio and Maryland, or to annex a penalty to the violation of those laws, and the action of the circuit courts was without jurisdiction and void. The act of Congress in question was passed, as it seems to me, in disregard of the object of the constitutional provision. That was designed simply to give to the general government the means of its own preservation against a possible dissolution from the hostility of the States to the election of representatives, or from their neglect to provide suitable means for holding such elections. This is evident from the language of its advocates, some of them members of the convention, when

the Constitution was presented to the country for adoption. In commenting upon it in his report of the debates, Mr. Madison said that it was meant " to give the national legislature a power not only to alter the provisions of the States, but to make regulations, *in case the States should. fail or refuse altogether.*" Elliott's Debates, 402.　And in the Virginia convention called to consider the Constitution, he observed that " it was found impossible to fix the time, place, and manner of the election of representatives in the Constitution.　It was found necessary to leave the regulation of these, in the first place, to the State governments, as being best acquainted with the situation of the people, subject to the control of the general government, in order to enable it to *produce uniformity and prevent its own dissolution.*" 3 id. 367.　And in the Federalist, Hamilton said, that the propriety of the clause in question rested " upon the evidence of the plain proposition that every government should contain in itself the means of its own preservation."

Similar language is found in the debates in conventions of the other States and in the writings of jurists and statesmen of the period.　The conduct of Rhode Island was referred to as illustrative of the evils to be avoided.　That State was not represented by delegates in Congress for years, owing to the character and views of the prevailing party ; and Congress was often embarrassed by their absence.　The same evil, it was urged, might result from a similar cause, and Congress should, therefore, possess the power to give the people an opportunity of electing representatives if the States should neglect or refuse to make the necessary regulations.

In the conventions of several States which ratified the Constitution an amendment was proposed to limit in express terms the action of Congress to cases of neglect or refusal of a State to make proper provisions for congressional elections, and was supported by a majority of the thirteen States ; but it was finally abandoned upon the ground of the great improbability of congressional interference so long as the States performed their duty.　When Congress does interfere and provide regulations, the duty of rendering them effectual, so far as they may require affirmative action, will devolve solely upon the Federal government.　It will then be Federal power which is

to be exercised, and its enforcement, if promoted by punitive
sanctions, must be through Federal officers and agents ; for, as
said by Mr. Justice Story in *Prigg* v. *Pennsylvania*, " The
national government, in the absence of all positive provisions
to the contrary, is bound, through its own proper department,
legislative, judicial, or executive, as the case may require, to
carry into effect all the rights and duties imposed upon it by
the Constitution." If State officers and State agents are em-
ployed, they must be taken, as already said, with the conditions
upon which the States may permit them to act, and without
responsibility to the Federal authorities. The power vested in
Congress is to alter the regulations prescribed by the legisla-
tures of the States, or to make new ones, as to the times, places,
and manner of *holding* the elections. Those which relate to
the times and places will seldom require any affirmative action
beyond their designation. And regulations as to the *manner
of holding* them cannot extend beyond the designation of the
mode in which the will of the voters shall be expressed and
ascertained. The power does not authorize Congress to deter-
mine who shall participate in the election, or what shall be the
qualification of voters. These are matters not pertaining to or
involved in the *manner of holding* the election, and their regu-
lation rests exclusively with the States. The only restriction
upon them with respect to these matters is found in the pro-
vision that the electors of representatives in Congress shall
have the qualifications required for electors of the most numer-
ous branch of the State legislature, and the provision relating
to the suffrage of the colored race. And whatever regulations
Congress may prescribe as to the manner of holding the election
for representatives must be so framed as to leave the election
of State officers free, otherwise they cannot be maintained. In
one of the numbers of the Federalist, Mr. Hamilton, in defend-
ing the adoption of the clause in the Constitution, uses this
language : " Suppose an article had been introduced into the
Constitution empowering the United States to regulate the
elections for the particular States, would any man have hesitated
to condemn it, both as an unwarrantable transposition of power,
and as a premeditated engine for the destruction of the State
governments ? The violation of principle in this case would

have required no comment." By the act of Congress sustained by the court, an interference with State elections is authorized almost as destructive of their control by the States as the direct regulation which he thought no man would hesitate to condemn.

The views expressed derive further support from the fact that the constitutional provision applies equally to the election of senators, except as to the place of choosing them, as it does to the election of representatives. It will not be pretended that Congress could authorize the appointment of supervisors to examine the roll of members of State legislatures and pass upon the validity of their titles, or to scrutinize the balloting for senators; or could delegate to special deputy marshals the power to arrest any member resisting and repelling the interference of the supervisors. But if Congress can authorize such officers to interfere with the judges of election appointed under State laws in the discharge of their duties when representatives are voted for, it can authorize such officers to interfere with members of the State legislatures when senators are voted for. The language of the Constitution conferring power upon Congress to alter the regulations of the States, or to make new regulations on the subject, is as applicable in the one case as in the other. The objection to such legislation in both cases is that State officers are not responsible to the Federal government for the manner in which they perform their duties, nor subject to its control. Penal sanctions and coercive measures by Federal law cannot be enforced against them. Whenever, as in some instances is the case, a State officer is required by the Constitution to perform a duty, the manner of which may be prescribed by Congress, as in the election of senators by members of State legislatures, those officers are responsible only to their States for their official conduct. The Federal government cannot touch them. There are remedies for their disregard of its regulations, which can be applied without interfering with their official character as State officers. Thus if its regulations for the election of senators should not be followed, the election had in disregard of them might be invalidated; but no one, however extreme in his views, would contend that in such a case the members of the legislature

could be subjected to criminal prosecution for their action. With respect to the election of representatives, so long as Congress does not adopt regulations of its own and enforce them through Federal officers, but permits the regulations of the States to remain, it must depend for a compliance with them upon the fidelity of the State officers and their responsibility to their own government. All the provisions of the law, therefore, authorizing supervisors and marshals to interfere with those officers in the discharge of their duties, and providing for criminal prosecutions against them in the Federal courts, are, in my judgment, clearly in conflict with the Constitution. The law was adopted, no doubt, with the object of preventing frauds at elections for members of Congress, but it does not seem to have occurred to its authors that the States are as much interested as the general government in guarding against frauds at those elections and in maintaining their purity, and, if possible, more so, as their principal officers are elected at the same time. If fraud be successfully perpetrated in any case, they will be the first and the greatest sufferers. They are invested with the sole power to regulate domestic affairs of the highest moment to the prosperity and happiness of their people, affecting the acquisition, enjoyment, transfer, and descent of property; the marriage relation, and the education of children; and if such momentous and vital concerns may be wisely and safely intrusted to them, I do not think that any apprehension need be felt if the supervision of all elections in their respective States should also be left to them.

Much has been said in argument of the power of the general government to enforce its own laws, and in so doing to preserve the peace, though it is not very apparent what pertinency the observations have to the questions involved in the cases before us. No one will deny that in the powers granted to it the general government is supreme, and that, upon all subjects within their scope, it can make its authority respected and obeyed throughout the limits of the Republic; and that it can repress all disorders and disturbance which interfere with the enforcement of its laws. But I am unable to perceive in this fact, which all sensible men acknowledge, any cause for the exercise of ungranted power. The greater its lawful power, the greater

the reason for not usurping more. Unrest, disquiet, and disturbance will always arise among a people, jealous of their rights, from the exercise by the general government of powers which they have reserved to themselves or to the States.

My second proposition is that it is not competent for Congress to make the exercise of its punitive power dependent upon the legislation of the States. The act upon which the indictment of the petitioner from Ohio is founded makes the neglect or violation of a duty prescribed by a law of the State in regard to an election at which a representative in Congress is voted for a criminal offence. It does not say that the neglect or disregard of a duty prescribed by any *existing* law shall constitute such an offence. It is the neglect or disregard of *any duty* prescribed by *any law* of the State *present or future*. The act of Congress is not changed in terms with the changing laws of the State; but its penalty is to be shifted with the shifting humors of the State legislatures. I cannot think that such primitive legislation is valid, which varies, not by direction of the Federal legislators, upon new knowledge or larger experience, but by the direction of some external authority which makes the same act lawful in one State and criminal in another, not according to the views of Congress as to its propriety, but to those of another body. The Constitution vests all the legislative power of the Federal government in Congress; and from its nature this power cannot be delegated to others, except as its delegation may be involved by the creation of an inferior local government or department. Congress can endow territorial governments and municipal corporations with legislative powers, as the possession of such powers for certain purposes of local administration is indispensable to their existence. So, also, it can invest the heads of departments and of the army and navy with power to prescribe regulations to enforce discipline, order, and efficiency. Its possession is implied in their creation; but legislative power over subjects which come under the immediate control of Congress, such as defining offences against the United States, and prescribing punishment for them cannot be delegated to any other government or authority. Congress cannot, for example, leave to the States the enactment of laws and restrict the United States to their

enforcement.    There are many citizens of the United States in
foreign countries, in Japan, China, India, and Africa.    Could
Congress enact that a crime against one of those States should be
punished as a crime against the United States?    Can Congress
abdicate its functions and depute foreign countries to act for
it?    If Congress cannot do this with respect to offences against
those States, how can it enforce penalties for offences against
any other States, though they be of our own Union?    If Con-
gress could depute its authority in this way; if it could say
that it will punish as an offence what another power enacts as
such, it might do the same thing with respect to the commands
of any other authority, as, for example, of the President or the
head of a department.    It could enact that what the President
proclaims shall be law; that what he declares to be offences
shall be punished as such.    Surely no one will go so far as
this, and yet I am unable to see the distinction in principle
between the existing law and the one I suppose, which seems
so extravagant and absurd.

I will not pursue the subject further, but those who deem
this question at all doubtful or difficult, may find something
worthy of thought in the opinions of the Court of Appeals
of New York and of the supreme courts of several other
States, where this subject is treated with a fulness and learn-
ing, which leaves nothing to be improved and nothing to be
added.

I am of opinion that the act of Congress was unauthor-
ized and invalid; that the indictment of the petitioner from
Ohio, and also the indictments of the petitioners from Mary-
land, and their imprisonment, are illegal, and that, therefore,
they should all be set at liberty.