### CUYLER v. ATLANTIC & N. C. R. CO.

### In re DANIELS.

(Circuit Court, E. D. North Carolina. July 23, 1904.)

1. FEDERAL COURTS — JURISDICTION — CONTEMPT—STATUTES — CONSTRUCTION— NEWSPAPER PUBLICATIONS.

Rev. St. § 725 [U. S. Comp. St. 1901, p. 583], provides that the federal courts shall have power to punish contempts by fine and imprisonment, provided that such power shall not extend to any case except misbehavior in the presence of or so near the court as to obstruct the administration of justice, the misbehavior of officers of the court, and the disobedience or resistance of any such officer, party, juror, witness, or other person to any lawful writ, process, order, decree, or command of the court. *Held*, that the jurisdiction prescribed by such act was exclusive, and deprived the court of power to punish a newspaper publisher for contempt consisting of an editorial in his paper criticizing the official conduct and integrity of the court.

2. SAME—IMPRISONMENT—VOID JUDGMENT—HABEAS CORPUS.

Where a federal court rendered judgment against a newspaper publisher for contempt, which judgment was void as in excess of the court's jurisdiction, the publisher was entitled to discharge on habeas corpus.

In Equity.

James H. Pou, Thos. J. Jarvis, R. T. Gray, and R. W. Winston, for petitioner.

Harry Skinner, opposed.

PRITCHARD, Circuit Judge. In order to determine whether the petitioner is entitled to the relief prayed for in the petition upon which the writ of habeas corpus was issued, it is necessary to determine two questions: (1) Did the court which imposed the sentence in this case have jurisdiction? (2) Does this court have jurisdiction to hear and determine this case on a writ of habeas corpus?

The section under which the court based its action is 725 of the Revised Statutes [U. S. Comp. St. 1901, p. 583], which reads as follows:

"The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority: provided, that such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence or so near thereto as to obstruct the administration

¶ 2. See Habeas Corpus, vol. 25, Cent. Dig. § 20.

of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the said courts."

This act not only limits the power of the court, but employs language which clearly defines the power of the courts with respect to summary punishment for contempt, and applies to all courts, except perhaps the Supreme Court. It applies to the District and Circuit Courts, inasmuch as they were created by act of Congress, their powers and duties being granted by the act creating them and subsequent acts enlarging and diminishing their jurisdiction. The act of 1831 is a chart by which these courts are to be guided in cases where summary punishment for contempt is to be inflicted.

Justice Field, in Ex parte Robinson, 19 Wall., at page 510, 22 L. Ed. 205, in referring to the act of 1831, says:

"It limits the power of these courts, in this respect, to three classes of cases: First, where there has been misbehavior of a person in the presence of the courts, or so near thereto as to obstruct the administration of justice; second, where there has been misbehavior of any officer of the courts in his official transactions; and, third, where there has been disobedience or resistance by any officer, party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the courts. As thus seen, the power of these courts in the punishments of contempts can only be exercised to insure order and decorum in their presence, to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes."

In Kent's Commentaries, volume 1, note on page 340, at bottom, it is said, in speaking of the act of 1831:

"That act had withdrawn from the courts of the United States the common-law power to protect their suitors, officers, witnesses, and themselves against the libels of the press, however atrocious, and though published and circulated pending the very trial of the cause."

In the Case of Savin, 131 U. S. 274, 9 Sup. Ct. 701, 33 L. Ed. 150, Justice Harlan, among other things, says:

"The act of 1789 did not define what were the contempts of the authority of the courts of the United States in any cause or hearing before them, nor did it prescribe any special procedure for determining a matter of contempt. Under that statute the question whether particular acts constituted a contempt, as well as the mode of proceeding against the offender, was left to be determined according to such established rules and principles of the common law as were applicable to our situation. The act of 1831, however, materially modified that of 1789, in that it restricted the power of the court to inflict summary punishment for contempt to certain specified cases, among which was misbehavior in the presence of the court, or misbehavior so near thereto as to obstruct the administration of justice."

In Ex parte Poulston, 19 Fed. Cas., on page 1206 (No. 11,350), Baldwin, J., says:

"On March 2, 1831 (4 Stat. 487, c. 99 [U. S. Comp. St. 1901, p. 583]), Congress passed an act declaratory of the law concerning contempt of court. * * * The history of this act, the time of its passage, its title and provisions, must be considered together, in order to ascertain its meaning and true construction. It was enacted shortly after the acquittal of Judge Peck, of Missouri, on an impeachment preferred against him for issuing an attachment against a member of the bar for making a publication in relation to a suit which had been decided by that judge. On the trial the law of contempt was elaborately

examined by the learned managers of the House of Representatives and the counsel for the judge. It was not controverted that all courts had power to attach any person who should make a publication concerning a cause during its pendency, and all admitted its illegality when done while the cause was actually on trial. It had too often been exercised to entertain the slightest doubt that the courts had power, both by the common law and the express terms of Judiciary Act Sept. 24, 1789, c. 20, § 17, 1 Stat. 83, as declared by the Supreme Court, to protect their suitors by the process of attachment. With this distinct knowledge and recognition of the existing law, it cannot be doubted that the whole subject was within the view of the Legislature; nor that they acted most advisedly on the law of contempt, intending to define in what cases the summary power of the courts should be exercised and to confine it to the specified cases. From the title and phraseology of the act it would seem to have been their intention to declare that it never existed in any other cases than those enumerated. It is 'a declaratory act,' which is a declaration of what the law 'was, is, and shall be hereafter taken' when put into the form usual in statutes which operate to settle the law retrospectively. * * * The acts of 1831 must be taken to be the declared construction of this and all other laws limiting its operation in the manner prescribed, and, as generally considered, Congress is to this court what the Constitution is to the Supreme Court. * * * It is in the discretion of the legislative power to confer upon the courts a summary jurisdiction to protect their suitors or itself by summary process, or to deny it. It has been thought proper to do the latter in language too plain to doubt of the meaning of the law, or, if it could be doubted by any ordinary rule of construction, the occasion and circumstances of its enactment would most effectually remove them. It would ill become any court of the United States to make a struggle to retain any summary power the exercise of which is manifestly contrary to the declared will of the legislative power. * * * The law prohibits the issuing of an attachment except in certain cases, of which the present is not one. It would, therefore, be not only utterly useless, but place the court in a position beneath contempt, to grant a rule to show cause why an attachment should not issue, when an exhibition of the act of 1831 would show most conclusive cause. The court is disarmed in relation to the press. It can neither protect itself nor its suitors. Libels may be published upon either without stint. The merits of a cause depending for trial or judgment may be discussed at pleasure. Anything may be said to the jurors through the press, the most willful misrepresentations made of judicial proceedings, and any improper mode of influencing the decision of causes by out of door influence practiced with impunity."

Rapalje on Contempt, in section 56, says:

"But mere libels on the judge as a man and an officer, printed in a newspaper, are not contempts. Thus a newspaper article, published during the sitting of a court, pending the trial before that court of the prisoner indicted for murder, charging the presiding judge of being an abetter of the murderer, is not a contempt of the court, but a mere libel upon the functionary. * * * The force of public opinion in this country in favor of the freedom of the press has restrained the free exercise of the power to punish this class of contempts, and in many jurisdictions statutes have been enacted depriving the court of the power to punish them. It was taken from the federal courts by the act of Congress of 1831, which act deprives those courts of the common-law power to protect by this process their suitors, witnesses, officers, and themselves against the libel of the press, though published and circulated pending the trial of a cause therein. * * *"

Under the judiciary act of September 24, 1789, c. 20, § 17, courts of the United States were given "power to punish by fine or imprisonment, at the discretion of the said court, all contempts of authority in any cause or hearing before the same." The act of 1789 did not define or limit the power or authority of the court of the United States to inflict summary punishment in any cause or hearing before

them. It was also silent as to any rules of procedure for determining what constituted contempt. As to what particular acts constituted contempt, as well as the mode of procedure against the offender, was to be determined in accordance with the established rules and principles of the common law with reference to existing conditions. Under this act it was contended that the authority which the courts had to punish for contempt at their discretion had been greatly abused, and, in order that the citizen might not be subjected to annoyance on account of the commission of acts not contemplated by the law, and that the freedom of the press as well as the liberty of the individual might be preserved in the spirit guarantied by the Constitution, Congress defined the limit to which the courts could go in such cases. Section 725 of the Revised Statutes is in the nature of a limitation of the power of the court to punish for contempt.

An examination of the record discloses the fact that the petitioner is the editor of a daily newspaper published in the city of Raleigh, N. C., where the court was held. It also appears that on the 29th day of May a receiver was appointed for the Atlantic & North Carolina Railroad Company in a proceeding pending before the court for that purpose. That on Sunday after the receiver was appointed the petitioner published an editorial in his paper, in which the court was severely criticised for its conduct in appointing such receiver. It is alleged in the rule against the petitioner that divers other editorials reflecting on the official integrity of the court had been published in said paper. The record does not show that the alleged misbehavior of the petitioner was in the presence of the court, or so near thereto as to obstruct the administration of justice; nor is there anything to show that the alleged misbehavior of petitioner interfered with the court, or that it tended in the slightest degree to disturb the orderly proceedings of the court. The inherent power of the court to punish for contempt is based upon the theory that it is essential that the court should possess ample authority to secure the free and unobstructed exercise of its functions in the enforcement of the law. Therefore it is only such acts as tend to interfere with the orderly proceedings of the court or with the due administration of justice that can be properly punished as a contempt of court. Words written or spoken at a place other than where the court is held, and not so near thereto as to interfere with the proceeding of the court, do not render the author liable. Any loud noise or other disturbance in the presence of the court, or in the street or other place so near thereto as to interfere with the orderly proceedings of the court, would undoubtedly tend to obstruct the administration of justice, and under such circumstances the court is empowered to summarily punish for contempt. That newspapers sometimes engage in unwarranted criticism of the courts cannot be denied. In some instances they construe the liberty of the press as a license to authorize them to engage in a wholesale abuse of the court, but these instances are rare, and do not warrant a departure from the well-settled principles of the law as declared by Congress and construed by the courts. If judges charged with the administration of the law are not to be criticised on account of their official conduct, the lib-

erty of the press is abridged, and the rights of individuals imperiled. While all citizens should entertain due respect for the courts of the land, it does not follow that editors and public speakers are to refrain from legitimate criticism of the acts of any tribunal. Such criticism should be invited by public officials, in order that the people may fully understand what is being done by those who are acting as their agents in the administration of the law.

Public questions are generally settled in the right way, and the fact that such is the case is due in a large measure to their free and untrammeled discussion by the press of the country. The courts are constituted for the purpose of protecting the rights and liberties of the individual, and the enactment of any law which gives a judge the power to prevent the free and unrestrained discussion of questions which may come before the court for adjudication would in many instances defeat the very object for which the courts were established. There may be instances where the publication of editorials or other matter in newspapers would bring the author within the limitations of the statute. For instance, if a newspaper editor should publish an article concerning a trial which was being considered by a jury, and should send a copy of the paper containing such article to the jury, or a member thereof, during the progress of the trial, for the purpose of influencing them in their deliberations, it would present a question whether such conduct would not be misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice. In order to determine whether this court has jurisdiction to hear this cause in the proceeding now instituted it is necessary to ascertain whether the court whose action is complained of had authority to impose the judgment. It appears that the distinguished judge who adjudged the petitioner to be in contempt of court exceeded the authority granted in the act of 1831, and that the court was without jurisdiction. Such being the case, the judgment of the court is void, and therefore a nullity.

In Ex parte Buskirk, 72 Fed. 21, 18 C. C. A. 410, the court, in considering the question of whether one committed for contempt might be discharged on a writ of habeas corpus, says:

"In the light of the recent decisions of the Supreme Court of the United States it is no longer an open question that, if the court whose action is complained of had no authority to pass the sentence imposed, the same is therefore void, for the reason that the court acted without jurisdiction, and, further, that in such cases the party seeking relief may be discharged on habeas corpus. Ex parte Terry, 128 U. S. 289, 9 Sup. Ct. 77, 32 L. Ed. 405; In re Coy, 127 U. S. 731, 8 Sup. Ct. 1263, 32 L. Ed. 274; Ex parte Harding, 120 U. S. 782, 7 Sup. Ct. 780, 30 L. Ed. 824; In re Ayers, 123 U. S. 443, 8 Sup. Ct. 164, 31 L. Ed. 216; In re Swan, 150 U. S. 637, 14 Sup. Ct. 225, 37 L. Ed. 1207. The proceedings of a court which has acted in excess of its jurisdiction are void, as much so as are the proceedings of a court which has acted without jurisdiction. In either its order of commitment is a nullity, and the party prejudiced may be discharged on a writ of habeas corpus."

Ex parte Reed, 100 U. S. 13, 25 L. Ed. 538; Ex parte Clarke, 100 U. S. 399, 25 L. Ed. 715; Ex parte Rowland, 104 U. S. 604, 26 L. Ed. 861; Ex parte Curtis, 106 U. S. 371, 27 L. Ed. 232; Ex parte Fisk, 113 U. S. 713, 5 Sup. Ct. 724, 28 L. Ed. 1117; Ex parte Wilson, 114 U. S. 417, 5 Sup. Ct. 935, 29 L. Ed. 89.

In view of the foregoing the court finds that the petitioner is unlawfully restrained of his liberty, and it is therefore considered and ordered by the court that the said Josephus Daniels be discharged from the custody of the marshal of the United States, and that he go hence without day.