**UNITED STATES of America,**
**Plaintiff,**

v.

**Cecil MANNING, as Registrar of Voters of East Carroll Parish, Louisiana, and the State of Louisiana, Defendants.**

**Civ. A. No. 8257.**

United States District Court
W. D. Louisiana,
Monroe Division.

Feb. 23, 1963.

St. John Barrett, Frank M. Dunbaugh, Gerald P. Choppin, Dept. of Justice, Washington, D. C., Edward L. Shaheen, U. S. Atty. for Western Dist. of Louisiana, for plaintiff.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Carroll Buck, First Asst. Atty. Gen., Albin P. Lassiter, Dist. Atty., Fourth Judicial District, Thompson L. Clarke, Dist. Atty., Sixth Judicial District, Harry J. Kron, Jr., William P. Schuler, Asst. Attys. Gen., Thomas W. McFerrin, Sp. Counsel, Cecil Manning, as Registrar of Voters of East Carroll Parish, Louisiana, and the State of Louisiana, for defendants.

Before WISDOM, Circuit Judge, and CHRISTENBERRY and HUNTER, District Judges.

WISDOM, *Circuit Judge.*

In this action the State of Louisiana strikes at the vitals of the Civil Rights Act of 1960. These vitals are the power of a federal district court to make a find-

ing of a pattern of discrimination in the denial of registration to Negroes and the concomitant power of the court itself to redress the grievance or to use a voting referee, should the court decide to utilize a referee as an arm of the court in undoing the discrimination. 42 U.S.C.A. § 1971(e).[1] The Attorney General of Louisiana contends that the statute is unconstitutional because it (1) invades rights reserved to the states by the Tenth Amendment, (2) delegates a non-judicial function to the district court, and (3) injects the court into a matter that is not a "case or controversy." These contentions are embodied in the State's complaint and motion which were not filed in the form of an original law-suit but were filed, captioned, and numbered in United States v. Manning et al., the lawsuit filed initially by the Attorney General of the United States under 42 U.S. C.A. § 1971. This three-judge court was constituted to consider the State's complaint and motion. (All other proceedings in this case have been heard by a single judge.) At the conclusion of the hearing on the State's complaint and motion, the court rendered an informal opinion from the bench upholding the constitutionality of the Act. We announced that our reasons would be stated more fully in a formal opinion.[2] We now state these reasons.

First, however, we review briefly the proceedings leading up to the present phase of the action.

April 28, 1961, the Attorney General of the United States filed a complaint alleging that Cecil Manning, registrar of voters of East Carroll Parish, Louisiana, was discriminating against Negro applicants for registration. Under 42 U.S. C.A. § 1971(c), as amended by the Civil Rights Act of 1960, the State of Louisiana was named a party defendant. May 30, 1962, the district court entered judgment for the plaintiff on the finding that Negro citizens in the parish had been deprived of their right to vote, in violation of 42 U.S.C.A. § 1971(a), "pursuant to a pattern or practice" within the meaning of Section 1971(e). Thereafter, 78 Negro citizens of East Carroll Parish applied to the court under the provisions of the statute here challenged for orders declaring them qualified to vote under state law. July 12, 1962, after an ex parte hearing,[3] the court entered an order finding that twenty-eight of the applicants were qualified to vote. A copy of this order was served upon each of the parties, and the plaintiff and defendants were allowed an opportunity to file objections. The State of Louisiana filed objections to the court's findings with respect to all twenty-eight applicants found qualified; the United States filed an ob-

[1.] That subsection was enacted by the 86th Congress in Title VI of the Civil Rights Act of 1960 (74 Stat. 86). It reads as follows:

"In any proceeding instituted pursuant to subsection (c) of this section in the event the court finds that any person has been deprived on account of race or color of any right or privilege secured by subsection (a) of this section, the court shall upon request of the Attorney General and after each party has been given notice and the opportunity to be heard make a finding whether such deprivation was or is pursuant to a pattern or practice. If the court finds such pattern or practice, any person of such race or color resident within the affected area shall, for one year and thereafter until the court subsequently finds that such pattern or practice has ceased, be entitled, upon his application

therefor, to an order declaring him qualified to vote, upon proof that at any election or elections (1) he is qualified under State law to vote, and (2) he has since such finding by the court been (a) deprived of or denied under color of law the opportunity to register to vote or otherwise to qualify to vote, or (b) found not qualified to vote by any person acting under color of law. * * *"

[2.] United States v. Cecil Manning, as Registrar of Voters of East Carroll Parish, Louisiana, and the State of Louisiana, D.C., 206 F.Supp. 623 (1962).

[3.] Although counsel for both the plaintiff and the defendants were present at the hearing as observers, they did not participate. The court itself examined each applicant.

jection to the court's finding with respect to one of the applicants found unqualified. A hearing on the objections was set for the afternoon of July 23.

On the morning of July 23, the State of Louisiana filed a "complaint and motion" alleging that the court, in proceeding to act upon the applications of Negroes pursuant to 42 U.S.C.A. § 1971(e), was "acting as registrar," and that the provisions of Section 1971(e) authorizing the judge so to act were an unconstitutional delegation of non-judicial powers upon a federal judge. The State asked that a three-judge court be convened under 28 U.S.C.A. § 2284; that the court declare Section 1971(e) unconstitutional and enjoin its enforcement.[4]

The State did not name the persons against whom the injunction was to run. With its "complaint and motion", however, the State filed a motion for temporary restraining order against United States District Judge Edwin F. Hunter, Jr., "his subordinates, agents, and his successors and assigns from executing or enforcing the terms or provisions of 42 U.S.C.A. 1971(e)." Judge Hunter, before whom the present litigation was pending, recused himself. Judge Wisdom, sitting in Judge Hunter's place by special assignment, denied the motion. The court set the matter for hearing on the merits the following day.

In accordance with the State's request, a three-judge district court was convened. July 24, 1962, the court heard the matter and, after a short recess at the conclusion of the hearing, the court denied the relief sought by the State and dismissed the "complaint and motion." D.C., 206 F.Supp. 623 (1962).

### I.

### The Tenth Amendment as a Barrier to Federal Action under the Civil Rights Act

A. *Background.* We approach the problem posed by the State's reliance on the Tenth Amendment with unalloyed respect for the values of federalism and for the root-principle of American federalism—fractionation of governmental power through the constitutional recognition of the standing of states as political entities, not as administrative divisions of a central government. We have fixed firmly in our minds counsels of caution from two profound students of federalism. In measured terms Woodrow Wilson pointed out:

"The question of the relation of the States to the federal government is the cardinal question of our constitutional system. At every turn of our national development we have been brought face to face with it, and no definition either of statesmen or of judges has ever quieted or decided it * * *

"It is difficult to discuss so critical and fundamental a question calmly. * * * [B]ecause it lies at the heart of our constitutional system, to decide it wrongly is to alter the whole structure and operation of our government, for good or for evil * * * *A sobering sense of responsibility should fall upon every one who handles it*".[5] (Emphasis ours.)

Justice Frankfurter has cautioned:

"The interpenetrations of modern society have not wiped out state lines. It is not for us to make inroads upon our federal system either by indifference to its maintenance or excessive regard for the unifying forces of modern technology. Scholastic reasoning may prove that no activity is isolated within the boundaries of a single State, but that cannot justify absorption of legislative

---

4. In our earlier opinion we stated, "In order to eliminate uncertainty as to the legal effect of the court having been improperly convened, each judge of this Court expressly adopts as his own findings, conclusions, and decree all of the findings, conclusions, and decree of this three judge court." 206 F.Supp. 623, 625.

5. Wilson, Constitutional Government in the United States 173 (N.Y.1921).

power by the United States over every activity." [6]

But nothing in the language or history of the Tenth Amendment gives the State exclusive sovereignty over the election processes against the federal government's otherwise constitutional exercise of a power within the scope of Article I, Section 4 of the Constitution and the Fourteenth and Fifteenth Amendments. In Justice Holmes's phrase, this "is not a controversy between equals." [7] It is necessary at this time to say again, and underscore it, that *within the area of delegated power, express or implied, the Tenth Amendment does not reduce the powers of the United States.* Instead, notwithstanding its origin, the Tenth Amendment reaffirms the reality of the nation as a nation. It reaffirms the sovereignty of the federal union when a conflict between a state and the United States puts the national interest at stake.

The Tenth Amendment does not stand in lonely isolation. It must be read along with the rest of the Constitution, including the Supremacy Clause and the Necessary and Proper Clause. The Supremacy Clause, Article VI, Clause 2, is the keystone of the Constitution and the principal feature distinguishing the Constitution from the Articles of Confederation. It reads:

"This Constitution, and the laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."

The Necessary and Proper Clause, Article 1, Section 8, Clause 18, imperative to effective government, reads:

"The Congress shall have Power * * * [t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

The Tenth Amendment must be read in the light of its history. A comparison of the amendment with Article II of the Articles of Confederation is a fair starting point.

In 1777 the Continental Congress adopted the Articles of Confederation. Its structural weakness as a frame of government was obvious: each state considered itself an independent sovereignty and "decisions of Congress were little more than recommendations." [8] The Second Article expresses clearly the dominant intention of its framers to make the Confederation a league of independent, sovereign states: [9]

"Each State retains its sovereignty, freedom and independence, and every power, jurisdiction and right which is not by this confederation expressly delegated to the United States, in Congress assembled."

There is no counterpart of this article in the original United States Constitution of 1789. That was no oversight. Article II, more than any other provision, made the Confederation unworkable.

The debates on ratification of the Constitution made it clear, however, that the

6. Polish National Alliance v. N. L. R. B., 1944, 322 U.S. 643, 650, 64 S.Ct. 1196, 88 L.Ed. 1509.

7. Sanitary District of Chicago, 1925, 266 U.S. 405, 425, 45 S.Ct. 176, 69 L.Ed. 352.

8. Farrand, The Framing of the Constitution 45 (Yale 1962).

9. "The fundamental principle of the Revolution was that the colonies were co-ordinate members with each other and with Great Britain, in an empire united by a common executive, and not united by any common legislative sovereign. The legislative power was maintained to be as complete in each American Parliament as in the British Parliament." 6 Writings of James Madison 373 (1906).

states needed reassurance as to their share of the division of powers between the federal and state governments.[10] The Tenth Amendment came into being to give that reassurance. It deals specifically with States' Rights. The amendment falls far short of the hopes of Patrick Henry, Richard Henry Lee, and other zealous advocates of State Sovereignty, for curtailment of "national" powers. It reads:

> "The powers not delegated *to the United States* by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, *or to the people*."[11]

The differences between this amendment and Article II of the Confederation strikingly demonstrate the subordination of the states to the nation in the new and revolutionary United States Constitution.[12] The Tenth Amendment (1) omits any reference to State sovereignty; (2) substitutes a *reservation* of undelegated powers for the *retention* of "sovereignty, freedom and independence, and every power, jurisdiction and right"; (3) eliminates the word "expressly" before the phrase "delegated to the United States;" (4) foreshadows the prohibition of the Fourteenth and Fifteenth Amendments in the clause referring to "power * * * prohibited by it to the States;" and, (5) significantly, makes the reservation run in favor of "the people", as well as the States.

The people in the Tenth Amendment can mean only "the people of the United States" in the preamble to the Constitution. "We the people of the United States"—not we the several States by compact among sovereignties and not we the people of the several States—ordained and established the Constitution, going beyond the call of the Convention, in order to secure "a more perfect union" than the "firm league of friendship" established by the Confederation.[13] As Farrand observed: This Constitution is "the supreme Law of

10. In general, on the establishment of the Constitution, see Farrand, ed., The Records of the Federal Convention of 1787 (1911); Elliot, ed., The Debates in the Several State Conventions on the Adoption of the Federal Constitution (1836). Ford, ed. Essays on the Constitution (1892); Ford, ed., Pamphlets on The Constitution (1888). See also McLaughlin, The Confederation and the Constitution (1905); Jensen, The Articles of Confederation, 263 (1940); Warren, The Making of the Constitution (1929); Kelley and Harbison, The American Constitution (1929); Rutland, The Birth of the Bill of Rights (1962).

11. Madison's original proposal did not include the italicized words. The amendment was Number Twelve on Madison's list of proposed amendments.

12. Crosskey considers these differences at length. I Politics and the Constitution, pp. 675–708 (1953). Crosskey's construction of the Tenth Amendment and the documentation of his views have value in themselves, without the necessity of one's accepting his general conclusion that the Constitution created a national, not a federal, government. He considers that "the one key-word common to the Articles and the Tenth Amendment, that is, the word 'delegated' —was used, in the Articles, in contradistinction to the word 'retains' * * * So, 'delegated' in the Articles, must have meant 'parted with absolutely;'" that it was carried over into the Tenth Amendment in the same sense; that in contemporary usage "delegated" meant "alienated." He argues that "reserve" was used in its technical, conveyancing sense, "to indicate the creation of a *new* interest, never previously existing as such, in respect of a thing conveyed;" that the "use of the word 'reserved' in the Tenth Amendment, implied, first of all, that the whole thing—'sovereignty'— out of which the reserved powers of the states were created—i. e. 'reserved'— had, at the same time been conveyed to the nation;" that "that the 'reserved powers' of the states were not excepted fragments of the states' pre-existing 'sovereignties' but newly created powers which grew out of, and depended for their nature absolutely on the Constitution;" that "the national authority * * * was general in character." To Crosskey the People, by the Constitution, "transfer[red] 'supremacy' or 'sovereignty' from the states to the nation": "the 'reserved' powers of 'the States respectively' in the Tenth Amendment, had, once more, to be *subordinate* powers."

13. Corwin, The Constitution and What it. Means Today 237 (1953).

the Land. [It is] not a treaty, nor an agreement [compact] between sovereign states, but a law. It was a law enacted by the highest of all lawmaking bodies, the people; and in its enforcement the government was backed by all the armed power of the nation; but the significance is that it was a law, and as such was enforceable in the courts." [14]

In debating the amendment, three times Congress voted down resolutions to insert the word "expressly" before the word "delegated". [15] John Marshall regarded this omission as crucial in the construction of the Constitution:

"But there is no phrase in the instrument which, like the articles of confederation, excludes incidental or implied powers; and which requires that everything granted shall be expressly and minutely described. Even the 10th amendment, which was framed for the purpose of quieting the excessive jealousies which had been excited, omits the word 'expressly,' and declares only that the powers 'not delegated to the United States, nor prohibited to the states, are reserved to the states or to the people;' thus leaving the question, whether the particular power which may become the subject of contest has been delegated to the one government, or prohibited to the other, to depend on a fair construction of the whole instrument. The men who drew and adopted this amendment had experienced the embarrassments resulting from the insertion of this word in the articles of confederation, and probably omitted it to avoid those embarrassments." McCulloch v. Maryland, 4 Wheat. 316, 400, 4 L.Ed. 579, 601.

In the debates on the amendments, James Madison, "Father of the Constitution", who proposed the Tenth Amendment, said, "No government ever existed which was not necessarily obliged to exercise powers by implication." [16] Whatever second thoughts Madison may have had years later, on June 8, 1791, when he offered his amendments to Congress, he emphasized that none of his proposed amendments "would endanger any part of the Constitution which [had been] considered as essential to the existence of the government by those who promoted its adoption". [17] He referred in terms to the Tenth Amendment and to the fact that several of the state conventions had been "particularly anxious that it should be declared in the Constitution that the powers not therein delegated should be reserved to the States". This might be "deemed unnecessary", Madison said,

---

14. Farrand, The Framing of the Constitution 209 (Yale 1962).

15. The proposal to insert "expressly" was rejected in the House August 17 and August 21, 1789; in the Senate September 7, 1789. 1 Annals of Congress 761 (1789); Journal of the House 108 (1789); Journal of the Senate, 1st Sess., 122 (1789). The omission is especially significant in view of the strong feeling in some of the ratifying conventions that "it [should] be explicitly declared that all powers not expressly delegated to Congress are reserved to the several States, to be by them exercised * * * [as] is consonant with the second article in the present confederation". John Adams in the Massachusetts Convention 2 Elliot's Debates 131.

Virginia and North Carolina placed first on their list of amendments one substantially similar to the present Tenth Amendment; "expressly" was omitted. Massachusetts, New York, Pennsylvania, and Maryland included "expressly". 2 Elliot's Debates (1836) 177, 406, 545, 550.

The first court to discuss the Tenth Amendment commented on the omission of "expressly." "Congress would be continually exposed, as their predecessors, under the confederation were, to the alternative of construing the term, expressly, with so much rigour as to disarm the government of all real authority whatever; or, with so much latitude, as to destroy, altogether the force of the restriction." United States v. The William, 1808, D.C.Mass., Fed.Cas.No. 16,700 at 622.

16. 1 Annals of Congress 761.

17. 1 Annals of Congress 433.

since "the whole of the instrument" implied it, but "there could be no harm in making such a declaration". Extremists went further. Thus, "Centinel", an anti-Constitution Pennsylvania writer, characterized the amendments as a "tub for the whale",[18] "an attempt to gull the people by professing to supply the defects of [the] constitution, whilst in reality they [were] mean[t] to confirm and perpetuate the fulness of the [national] dominion".[19]

■ In short, the Tenth Amendment "added nothing to the instrument as originally ratified";[20] as finally approved, it was not intended to curtail the powers of the United States derived from the unamended constitution. The Amendment was "not conceived to be a yardstick for measuring the powers granted to the Federal Government or reserved to the states".[21] And no one has put it more succinctly than James Madison:

"Interference with the powers of the States was no constitutional criterion of the power of Congress. If the power was not given, Congress could not exercise it; if given, they [Congress] might exercise it, although it should interfere with the laws, or even the Constitution of the States."[22]

Many years later, in United States v. Darby, 1941, 312 U.S. 100, 124, 61 S.Ct. 451, 462, 85 L.Ed. 609, Mr. Justice Stone paraphrased Madison:

"The amendment states but a truism that all is retained which has not been surrendered. There is nothing in the history of its adoption to suggest that it was more than declaratory of the relationship between the national and state governments as it had been established by the Constitution before the amendment or that its purpose was other than to allay fears that the new national government might seek to exercise powers not granted, and that the states might not be able to exercise fully their reserved powers. See e. g., II Elliot's Debates, 123, 131; III id. 450, 464, 600; IV id. 140, 149; I Annals of Congress, 432, 761, 767–768; Story, Commentaries on the Constitution, §§ 1907–1908."[23]

■ The argument the Attorney General of Louisiana makes in this action is strongly suggestive of the argument the Attorney General of Maryland made in McCulloch v. Maryland, 4 Wheat. 316, 4 L.Ed. 579 (1819), the first major attempt of a State to rely on the Tenth Amendment as a bar to Congressional action. Chief Justice Marshall's answer then is pertinent now. First, the Constitution

18. "Seamen have a custom, when they meet a whale, to fling out an empty tub by way of amusement to divert him from laying violent hands upon the ship." Jonathan Swift, The Tale of a Tub. Quoted in Crosskey, Politics and the Constitution (1953) p. 688.

19. Ibid, p. 685.

20. United States v. Sprague, 1931, 282 U.S. 716, 733, 51 S.Ct. 220, 223, 75 L. Ed. 640. "The Tenth Amendment, in other words, was added to the Constitution out of an abundance of caution. Its purpose was only to allay fears that the new National Government might seek to exercise powers not granted; its sole design was to exclude any interpretation by which powers beyond those which were granted might be assumed. But it has no substantive effect, either upon

the question of what powers are granted to the nation or upon the operation of the Supremacy Clause. It is really an express affirmation of what would, in any event, or any just reasoning, be a necessary rule of interpretation, * * *" 1 Schwartz, The Powers of Government (1963) 40–41.

21. Corwin. The Constitution and What it Means Today 232 (1954).

22. 11 Annals of Congress, Col. 1897 (1791).

23. Cf. "The general position is incontestible, that all that is not surrendered by the constitution is retained. The amendment which expresses this, is for greater security; but such would have been the true construction, without the amendment." United States v. The William, 1808, D.C.Mass., No. 16,700 at 622.

comes from "the people of the United States constituting one sovereign political community":

> "No political dreamer was ever wild enough to think of breaking down the lines which separate the states, and of compounding the American people into one common mass. Of consequence, when they act, they act in their states. But the measures they adopt do not, on that account, cease to be the measures of the people themselves, or become the measures of the state governments.

> "From these [ratifying] conventions the constitution derives its whole authority. The government proceeds directly from the people; is 'ordained and established' in the name of the people; and is declared to be ordained, 'in order to form a more perfect union, establish justice, insure domestic tranquillity, and secure the blessings of liberty to themselves and to their posterity.' The assent of the states, in their sovereign capacity, is implied in calling a convention, and thus submitting that instrument to the people. But the people were at perfect liberty to accept or reject it; and their act was final. It required not the affirmance, and could not be negatived, by the state governments.

Second, the Constitution was not a compact of sovereign states:

> "The constitution, when thus adopted, was of complete obligation, and bound the state sovereignties. * * To the formation of a league, such as was the confederation, the state sovereignties were certainly competent. *But, when, 'in order to form a more perfect union,' it was deemed necessary to change this alliance into an effective government, possessing great and sovereign powers, and acting directly on the people, the ne-cessity of referring it to the people, and of deriving its powers directly from them, was felt and acknowledged by all.*"

Finally, the Constitution is to be given a liberal construction because it is a Constitution "intended to endure for ages to come" and because when a power is given to the national government it is to "the interest of the nation to facilitate its execution."

> "[A] government, entrusted with such ample powers, on the due execution of which the happiness and prosperity of the nation so vitally depends, must also be entrusted with ample means for their execution. The power being given, it is the interest of the nation to facilitate its execution. * * * To employ the means necessary to an end, is generally understood as employing any means calculated to produce the end, and not as being confined to those single means, without which the end would be entirely unattainable. * * * We admit, as all must admit, that the powers of the government are limited, and that its limits are not to be transcended. But we think the sound construction of the constitution must allow to the national legislature that discretion, with respect to the means by which the powers it confers are to be carried into execution, which will enable that body to perform the high duties assigned to it, in the manner most beneficial to the people. *Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consistent with the letter and spirit of the constitution, are constitutional.*[24] * * * *This provision is made in a constitution intended to endure for*

24. Cf. Madison's statement in The Federalist, No. 44: "No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized; whenever a gen-eral power to do a thing is given, every particular power necessary for doing it is included." Again: "Without the substance of this power, the whole Constitution would be a dead letter."

282

*ages to come, and, consequently, to be adapted to the various crises of human affairs."*

A number of commentators have observed that the Supreme Court's views on the Tenth Amendment and the reserved powers of the States have oscillated between the philosophies of Hamilton and Jefferson.[25] Under the aegis of the Virginia and Kentucky resolutions and the "compact" theory, the "notion of National-State equality became in due course a part of the constitutional creed of the Taney Court"; the power "to promote the happiness and prosperity of the community" and to "provide for the public health, safety and good order" were sovereign powers reserved to the States by the Tenth Amendment.[26] Thus, the Supreme Court has held that internal matters within the police power of the states are beyond the reach of Congress;[27] that the federal income tax could not be levied on the salaries of state officers;[28] that an excise tax on the products of child labor was an unconstitutional invasion of the reserved powers of the States;[29] that sales of chicken brought from outside of the state were local matters beyond the regulation

of Congress.[30] Indeed, the Supreme Court, in effect, did what Congress refused to do: in Hammer v. Dagenhart the court inserted the word "expressly" before "delegated".[31] But in 1937–41 the Court returned to McCulloch v. Maryland. The Court sustained as constitutional the Agricultural Adjustment Act of 1938,[32] the Social Security Act,[33] and the National Labor Relations Act.[34] United States v. Darby, 1941, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609, from which we have previously quoted, overruled Hammer v. Dagenhart and upheld the constitutionality of the Fair Labor Standards Act against the contention that although the statute was nominally a regulation of commerce its motive or purpose was "[the] regulation of wages and hours of persons engaged in manufacture, the control of which has been reserved to the states". The Court held that the powers of Congress under the "necessary and proper" clause are no more limited by the reserved powers of the States than are its specifically enumerated powers. Justice Stone stated the principle that guides us in this case:

"Such regulation is not a forbidden invasion of state power merely be-

25. See Corwin, The Constitution and What It Means Today 232–37 (1954); Castro, Doctrinal Development of the Tenth Amendment, 51 W.Va.L.Q. 227, 231 (1949); Cowen, What is Left of the Tenth Amendment, 39 N.Carl.L.Rev. 153, 157 (1961); Corwin, The Passing of Dual Federalism, 36 Va.L.Rev. 1 (1950); 1 Haines, The Role of the Supreme Court in American Government Politics 218 (1944).

26. Corwin, The Passing of Dual Federalism, 36 Va.L.Rev. 1, 15 (1950). Compare Tucker, The Constitution of the United States (1899) with Schwartz, The Powers of Government (1963).

27. The states have "complete unqualified, and exclusive" sovereignty over all those powers which relate to merely municipal legislation or what might, perhaps, more properly be called internal police." New York v. Miln, 1837, 11 Pet. 102, 139, 9 L.Ed. 648. See also The License Cases, 1847, 5 How. 504, 573, 12 L.Ed. 256.

28. Collector v. Day, 1871, 11 Wall. 113, 20 L.Ed. 122.

29. Bailey v. Drexel Furniture Co., 1922, 259 U.S. 20, 42 S.Ct. 449, 66 L.Ed. 817.

30. Schechter Poultry Corp. v. United States, 1935, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570.

31. Hammer v. Dagenhart, 1918, 247 U.S. 251, 38 S.Ct. 529, 62 L.Ed. 1101. And in Lane County v. Oregon, 1868, 7 Wall. 71, 76, 19 L.Ed. 101, the court said, "all powers not *expressly* delegated to the national government [were] reserved to the states and to the people". See also United States v. Hudson and Goodwin, 1812, 7 Cranch 32, 33, 3 L.Ed. 259.

32. Wickard v. Filburn, 1942, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122.

33. Steward Machine Co. v. Davis, 1937, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279; Helvering v. Davis, 1937, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307.

34. National Labor Relations Board v. Jones & Laughlin Steel Corp., 1937, 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893.

cause either its motive or its consequence is to restrict the use of articles of commerce within the states of destination; and it is not prohibited unless by other Constitutional provisions. It is no objection to the assertion of the power to regulate interstate commerce that its exercise is attended by the same incidents which attend the exercise of the police power of the states." 312 U.S. 100, 114, 61 S.Ct. 451, 457, 85 L.Ed. 609.

■■■■ Here, then, the Civil Rights Act is not a forbidden invasion of states rights merely because it interferes with the State's power to regulate elections,— for the Tenth Amendment is not in itself a limitation on the otherwise constitutional powers of the United States, regardless of the extent to which the exercise of those powers conflicts with concurrent or similar powers of the State. The contention that a congressional act is unconstitutional because it interferes with the reserved powers of the states, as Marshall put it, is "an objection to the Constitution itself." United States v. Fisher, 2 Cranch 358, 397 (1805). The proper question is, looking at the Constitution as a whole, does the Act come within the express or implied power of Congress?

■■ B. *Article I, Section 4.* Section 4 of Article I of the Constitution provides:

"The Times, Places and *Manner of holding Elections* for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; But the Congress may at any time by Law *make or alter* such Regulations, except as to the Places of chusing Senators."

Section 4 is a broad and effective grant of authority to Congress over federal elections.[35] Ex parte Siebold, 1880, 100 U.S. 371, 25 L.Ed. 715, 717; Ex parte Clarke, 1879, 100 U.S. 399, 25 L.Ed. 715; United States v. Gale, 1883, 109 U.S. 65, 3 S.Ct. 1, 27 L.Ed. 857. "There is little regarding an election that is not included in the terms, time, place, and manner of holding it." United States v. Munford, 1833, C.C., E.D.Va., 16 F. 223. Carried with the express authority is the implied power, under the "necessary and proper clause", in the language of McCulloch v. Maryland, to accomplish the constitutional objective by "all means which are appropriate, which are plainly adapted to that end." United States v. Mosley, 1915, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355; United States v. Saylor, 1944, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341. For purposes of accomplishing the constitutional objective the electoral process is indivisible. The act of casting a ballot in a voting booth cannot be cut away

35. James Madison described the purpose of Article 1, Section 4, as follows:

"It was found impossible to fix the time, place, and manner of election of Representatives in the Constitution. It was found necessary to leave the regulation of these, in the first place, to the State governments as being best acquainted with the situation of the people, subject to the control of the General Government, in order to enable it to produce uniformity and prevent its own dissolution. * * * Were they exclusively under the control of the State governments, the General Government might easily be dissolved. But if they be regulated properly by the State legislatures the congressional control will probably never be exercised. The power appears to me satisfactory, and as unlikely to be abused as any part of the Constitution." 3 Farrand, Record, 311.

Similarly, In the Federalist, No. LIX, Hamilton wrote:

"They (the convention) have submitted the regulation of elections for the Federal Government, in the first instance, to the local administrations; which in ordinary cases, and when no improper views prevail, may be both more convenient and more satisfactory; but they have reserved to the national authority a right to interpose, whenever extraordinary circumstances might render that interposition necessary to its safety."

from the rest of the process. It is the last step in a process that starts with registration. Similarly, registration is an indivisible part of elections.

It should be noted that registration is for all elections. There is no separate registration for federal elections. Any interference with the qualified voter's right to register is therefore interference with a federal election.

■■ The Civil Rights Act of 1960 is based on the fact, obvious to all, that violations of suffrage rights are "usually accomplished through discriminatory application and administration of state registration laws." [36] In adopting the Act, Congress attempted to preserve the integrity of elections at its most significant point—the Registration Office. The registration of voters is relatively modern. For the "original understanding" of Section 4 to have meaning today, "the manner of holding elections" therefore must be read as referring to the entire electoral process, from the first step of regis-

tering to the last step, the State's promulgation of honest returns.

The contention that Section 1971(e) invades the reserved powers of the States rests on giving a narrow meaning to "the manner of holding elections" in Article 1, Section 4, and an unnecessarily broad meaning to "qualifications" in Article 1, Section 2. Article 1, Section 2 provides that "the Electors in each State shall have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." The Seventeenth Amendment makes this language applicable to elections of United States Senators. Thus, anyone qualified to vote for state legislators is qualified to vote for Congressmen and Senators; anyone not so qualified may not vote in congressional elections.

There is no doubt that, historically, the states have exercised exclusive authority to fix the qualifications of voters.[37] In the Constitutional Convention, Rufus King, a member of the Committee on

36. The Report of the United States Commission on Civil Rights 140 (1959). Dean Robert G. Storey, Vice Chairman of the Commission, testifying in favor of the Commission's recommendation of appointing federal registrars, observed: "The day when negroes openly were denied the right to vote by state law spread upon the statute books or embodied in the governing codes of political bodies is past. Nevertheless, in many places, the same end is achieved through discriminatory administration of state laws which seem fair upon their face". Hearings before the Senate Committee on Rules and Administration on S. 2684, S. 2719, S. 2783, S. 2814, S. 2722, S. 2785, S. 2535, 86 Cong., 2nd Sess. (1960), p. 24. "In the South registration assumes special importance. * * * Registration authorities determine whether applicants meet literacy and understanding tests and thus have functioned as the principal governmental agency for Negro disfranchisement." Key, Southern Politics (1949) p. 560.

37. 1 Story, Commentaries § 586 (1891); Warren, The Making of the Constitution 403 (1937). See recent discussion by Senator Sam J. Erwin, Jr., Literacy Tests for Voters, 27 Duke L. and Cont.Prob. 480 (1962), containing pertinent quotations of statements by Rufus King, Alex-

ander Hamilton, James Madison, and George Mason. Crosskey takes the opposite position. 1 Crosskey, Politics and the Constitution 531–33 (1953). So also does the author of a recent study based on close examination of Farrand, The Records of the Federal Convention. As to Article 1, Section 2, he concludes: "Inasmuch as the suffrage requirements in the states were constitutionally prescribed, the method provided by the Constitution represents a compromise between Congressional or state legislative control. It is clear, therefore, that this constitutional provision does not represent a concession to state sovereignty." As to Article 1, Section 4, after quoting various statements of Madison and others, he concludes: "The result of the debate, therefore, was that the ultimate and controlling power of Congress was confirmed and even expanded. * * * It is clear that this clause, although recognizing initial state power to control the electoral process, contrary, the insistence that ultimate power rests with Congress is an express assertion of national supremacy." Murphy, State Sovereinty and the Drafting of the Constitution, 31 Miss.L.Jour. 203, 234, 235, 236 (1960). See also Maggs and Wallace, Congress and Literacy Tests, 27 Duke L. and Cont.Prob. 510 (1962).

Style, stated, "The power of control given by this section [Section 4] extends to the manner of election and not to the qualifications of the electors." Alexander Hamilton agreed. James Madison and George Mason agreed. The Supreme Court has said that "the manner of holding elections * * * does not authorize Congress to determine * * * what shall be the qualifications of the voters." Ex parte Clarke, 1879, 100 U.S. 399, 25 L.Ed. 715. See also Ex parte Yarborough, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274.

The State's argument misses the target. We find no conflict between the Civil Rights Act and the traditional right of the States to determine the "qualifications" of voters. The Act does not purport to fix qualifications of voters or to give that right to any federal judge. It simply protects the right of voters, *qualified under state law,* to participate in elections. Section 1971(e) clearly states that the only voters who can be registered are those who, after a hearing, are found to be "qualified under State law to vote".

In Ex parte Siebold, 1880, 100 U.S. 371, 25 L.Ed. 717, the Supreme Court had before it the Enforcement Act which provided, among other extensive voting and registration regulations, for the appointment of federal election supervisors who were authorized "to cause such names to be registered as they may think proper to be so marked". The Court held that the meaning of "make or alter" was plain and the power of Congress paramount. "It may be exercised as and when Congress sees fit to exercise it. When exercised, the action of Congress, so far as it extends and conflicts with the regulations of the State, necessarily supersedes them. This is implied in the power "to make or alter". The Court said:

"It is the duty of the States to elect representatives to Congress. The due and fair election of these representatives is of vital importance to the United States. The government of the United States is no less concerned in the transaction than the State government is. It certainly is not bound to stand by as a passive spectator, when duties are violated and outrageous frauds are committed. It is directly interested in the faithful performance, by the officers of election, of their respective duties. Those duties are owed as well to the United States as to the State."

In United States v. Classic, 1941, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, there was no question of racial discrimination, and the Civil War Amendments were not involved. It was contended that "elections" did not include primary contests. The Court held that the phrase "manner of holding" was broad enough for Congress to protect voters against "interference" with the right to vote in a Democratic primary, *"the only stage of the election procedure when their choice is of significance"*. Mr. Justice Stone, for the Court, going back to McCulloch v. Maryland, pointed out that the "necessary and proper" clause applies to the congressional power under Article 1, Section 4, as well as to the other powers of Congress. Article 1, Section 8 gives Congress authority "[t]o make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, in any Department or Officer thereof". In the Classic case the Court noted that while, "in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states [citations], this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. 1, to the extent that Congress has not restricted state action by the exercise of its powers to regulate elections under § 4 and its more general powers under Article 1, § 8, Clause 18 of the Constitution 'to make all laws which shall be necessary and proper for carrying into execution the foregoing powers.'" The Court held that the right to choose representatives is

a constitutional right to have the votes counted. And, "since the constitutional command is without restriction or limitation, the right, unlike those guaranteed by the Fourteenth and Fifteenth Amendments, is secured against the action of individuals as well as of states". In Terry v. Adams, 1952, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152, the Supreme Court, relying on the Fifteenth Amendment, however, reached back to a pre-primary county election, having no legal effect, held within a private group not acting under color of a state law. In Ex parte Yarbrough, 1884, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274, the Supreme Court declared that the right to vote in Federal elections arose from the Federal Constitution and was subject to protection by federal legislation despite the fact that state laws prescribed the qualifications of electors. The Court observed that the Fifteenth Amendment "clearly shows that the right of suffrage was considered to be of supreme importance to the national government, and was not intended to be left within the exclusive control of the States".

██ A long line of federal statutes dealing with corrupt election practices shows the broad scope of congressional power to enact appropriate legislation, within the "manner of holding" clause, going beyond the conduct of the election. In Burroughs and Cannon v. United States, 1934, 290 U.S. 534, 54 S.Ct. 287, 78 L.Ed. 484, it was urged that the Federal Corrupt Practices Act, 2 U.S.C.A. § 241 et seq., was unconstitutional in that it required the keeping of detailed accounts of contributions and the reporting of campaign data; that the Congressional power is limited expressly in Article II, Section 1, to determining "the Time of chusing [presidential] Electors, and the Day on which they shall give their Votes". The Supreme Court, upholding the constitutionality of the Act, held that since Congress has the power to preserve the purity of presidential elections "the means to that end presents a question primarily addressed to the judgment of Congress". The Court said:

"While presidential electors are not officers or agents of the federal government * * *, they exercise federal functions under, and discharge duties in virtue of authority conferred by, the Constitution of the United States. The President is vested with the executive power of the nation. The importance of his election and the vital character of its relationship to and effect upon the welfare and safety of the whole people cannot be too strongly stated. To say that Congress is without power to pass appropriate legislation to safeguard such an election from the improper use of money to influence the result is to deny to the nation in a vital particular the power of self protection. Congress, undoubtedly, possesses that power, as it possesses every other power essential to preserve the departments and institutions of the general government from impairment or destruction, whether threatened by force or by corruption."

██ Section 1971(e) of the Civil Rights Act of 1960, dealing with registration, is certainly no less a regulation of the "manner of holding elections" than the Federal Corrupt Practices Act, which operates on the campaigning stage rather than the act of voting and operates on persons who are no official part of the election machinery. Even in Newberry v. United States, 1921, 256 U.S. 232, 41 S.Ct. 469, 65 L.Ed. 913, the Supreme Court had no difficulty in holding that Congress, under Article 1, Section 4, had the power to regulate campaign expenditures. In discussing the comprehensive power of Congress over federal elections, the Supreme Court has said:

"It will be seen from this statement of the important features of these enactments that Congress by them committed to federal officers a very full participation in the process of the election of Congressmen, *from the registration of voters to the final certifying of the results*, and that the control thus established over

such elections was comprehensive and complete." United States v. Gradwell, 1917, 243 U.S. 476, 483, 37 S.Ct. 407, 410, 61 L.Ed. 857.

 We hold that Section 1971(e) of the Civil Rights Act is within the scope of the clause allowing Congress to regulate the "manner of holding" elections. We find too that the provisions of the Act are appropriate to the legitimate congressional objective of protecting the integrity of the entire electoral process. The Act does not impair the right of a state to fix qualifications for voters. Instead of conflicting with this States' Right, the Act is designed to assure the right to vote of electors who are "qualified under State law" to vote.

 C. *The Fourteenth and Fifteenth Amendments.* Now, as before enactment of the Civil Rights Acts, the States have the unquestioned right to fix the qualifications of voters, to regulate the registration of voters, and to conduct elections. But no matter how extensive states' rights may be under the Tenth Amendment or Article 1, Section 2, the state law and administration of the law are subject to the federal constitutional standards established in the Fourteenth and Fifteenth Amendments. See Lassiter v. Northhampton Election Board, 1959, 360 U.S. 45, 51, 79 S.Ct. 985, 3 L.Ed.2d 1072. The Fifteenth Amendment provides broad authority for congress to correct racial discriminations. In addition, the Supreme Court has relied squarely on the equal protection clause of the Fourteenth Amendment to strike down unreasonable discrimination in the electoral process. Nixon v. Herndon, 1927, 273 U.S. 536, 47 S.Ct. 446, 77 L.Ed. 759. These amendments, independently of Article I, Section 4, are expressly enforceable by "appropriate legislation". They are, of course, not limited to elections for federal office.

In United States v. Raines, 1960, 362 U.S. 17, 80 S.Ct. 519, 4 L.Ed.2d 524, the Supreme Court held the Civil Rights Act of 1957 to be valid legislation under the Fifteenth Amendment. Justice Brennan, organ of the Court, said:

"It is, however, established as a fundamental proposition that every state official, high and low, is bound by the Fourteenth and Fifteenth Amendments. See Cooper v. Aaron, 358 U.S. 1, 16–19 [78 S.Ct. 1401, 3 L.Ed.2d 5, 15–17]. We think this Court has already made it clear that it follows from this that Congress has the power to provide for the correction of the constitutional violations of every such official without regard to the presence of other authority in the State that might possibly revise their actions."

See also United States v. Alabama, 1960, 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982.

 We see no merit to the argument that the Fifteenth Amendment deals only with denial of the right to vote, not with the registration of voters. This is similar to the argument that Article 1, Section 4 as restricted by Section 2 reserving to the states control of the qualifications of voters, gives Congress no power over registration. The Supreme Court set the record straight in striking down the "grandfather clause", one of the first schemes to deny registration to voters. Guinn v. United States, 1915, 238 U.S. 347, 35 S.Ct. 926, 59 L.Ed. 1340. The Court pointed out that the Fifteenth Amendment did not take away the States' power to fix qualifications; but it requires the tests for suffrage to be non-discriminatory. When Oklahoma later enacted a law giving Negro voters only twelve days to register and qualify to vote, the Supreme Court invalidated that law. Lane v. Wilson, 1939, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281. In a recent case Judge Bootle, for this Court, United States v. Dogan, 5 Cir., 314 F.2d 767, held: "[42 U.S.C.A. § 1971(a)] forbids any distinction in the voting process based upon race or color, irrespective of whether such distinction involves an actual denial of the [right to] vote. It applies not only to the physical act of vot-

ing but to the entire voting process, including the matter of paying poll taxes where the payment of poll taxes is a condition precedent to the right to vote, and including the matter of registration where registering is required in advance of voting." See also Davis v. Schnell, S.D.Ala.1949, 81 F.Supp. 872, aff'd 336 U.S. 933, 69 S.Ct. 749, 93 L.Ed. 1093; Byrd v Brice, W.D.La.1952, 104 F.Supp. 442, aff'd Bryce v. Byrd, 5 Cir., 201 F.2d 664; United States v. Penton, M.D.Ala., 212 F.Supp. 193 (1963). In United States v. Penton, Judge Johnson made the point we emphasize in this opinion: "[A]lthough the particular qualifications one must possess in order to exercise this right to vote are left to the states—as long as that exercise is within the constitutional framework—the power to protect citizens who are qualified to vote but not allowed to vote solely because of their color is confided in the United States Government."

Discrimination in the registration office is the worst kind of oppression of qualified voters, because it is oppression under color of law. Discrimination by a registrar is especially harmful because it is the most effective method for denying the right to vote: it denies the right to vote before an individual has the chance to exercise it, and it bars not only the individual concerned from all elections but inhibits other qualified voters from running the gauntlet of discriminatory and humiliating practices by a registrar and his deputies. It is unthinkable that Congress should not have the power to deal with the right to vote at the most vulnerable point in the electoral process. As the Supreme Court said, in an analogous context, in Ex parte Yarbrough, 1884, 110 U.S. 651, 661, 662, 4 S.Ct. 152, 157, 28 L.Ed. 274:

"[I]t is only because the Congress of the United States, through long

habit and long years of forbearance, has, in deference and respect to the States, refrained from the exercise of these powers, that they are now doubted."

When the States, by sophisticated registration requirements coupled with discriminatory practices by registrars, deny suffrage to qualified voters they cannot complain if Congress exercises its constitutional authority, under Article I, Section 4, to regulate the electoral process in federal elections and its Fourteenth-Fifteenth Amendment authority to prohibit discriminatory denial of the right to vote in federal and state elections. This is the rationale of the Civil Rights Cases, 1883, 109 U.S. 3, 3 S.Ct. 18, 27 L.Ed. 835, sustaining constitutionality of the predecessor statutes as "appropriate legislation." [38] The Supreme Court has construed broadly the equivalent clause in Section 5 of the Fourteenth Amendment:

"Whatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power." Ex parte Virginia, 100 U.S. 339, 25 L.Ed. 676, 679 (1880).

In United States v. Reese, 1876, 92 U.S. 214, 216, 23 L.Ed. 563; James v. Bowman, 1903, 190 U.S. 127, 23 S.Ct. 678, 47 L.Ed. 979; and Minor v. Happersett, 1875, 88 U.S. (21 Wall.) 162, 178, 22 L.Ed. 627, the Court, interpreting the second clause of the Fifteenth Amendment, struck down the congressional legislation. These decisions however were based, not on the ground that the legislation was in-

38. In the Civil Rights Cases the court considered the words "necessary and proper" in "the sweeping clause" as synonymous with "appropriate". This is to say, that Congressional power under the Fourteenth and Fifteenth Amendments should be construed as broadly as other powers of Congress. See Maggs and Wallace, Congress and Literacy Tests, 27 Duke Law and Cont.Prob. 510, 527 (1962).

appropriate, that is, used improper means to legitimate ends, but that it sought to achieve improper ends; the statutes sought to protect the voter against discrimination by private persons and against other discrimination than discrimination on the grounds of race, color, and previous condition of servitude. These decisions are not authority today for a narrow view of the term, "appropriate legislation".

■ We summarize. The object of the Act is to guarantee to qualified voters the right to register and vote. That end is within the scope of Article I, Section 4 and the Fourteenth and Fifteenth Amendments; the corrective registration plan embodied in Section 1971(e) is an appropriate means to accomplish the end. Congress has taken pains to accommodate the Act to States' Rights. For example, the Act does not affect the qualifications fixed by the State and no State registrar is replaced by a federal registrar.[39] It is not for this court to inquire whether the statute is good or bad, or whether state laws are adequate or inadequate for dealing with the problem. The States must make an accommodation too. To the extent a conflict exists, the Supremacy Clause requires the States to yield to the will of the nation.

## II.

### The Court's Exercise of Allegedly Non-Judicial Functions.

A. *The court's direct assumption of non-judicial functions.* The State urges that Section 1971(e) is not actually a regulation of state activity to assure state compliance with the Fifteenth Amendment, nor is it a means for affording *judicial* relief for non-compliance. Instead, so the State argues, the Act is an effort to *displace* state officials (i. e., the registrars of voters) in the performance of their state duties, and to replace them by a United States District Judge acting in an administrative rather than a judicial capacity. This contention is said to

rest on the reserved power of the State under the Tenth Amendment, but the crux of the question is whether a district judge, in carrying out the provisions of 1971(e), is exercising an executive function in violation of Article III vesting only judicial power in the courts.

■ The grant of judicial power in Article III implies the limitation that courts may not exercise legislative or executive powers. By "giving to the courts ' "judicial power" the Constitution presupposed an historic content for that phrase and relied on assumption by the judiciary of authority only over issues which are appropriate for disposition by judges.' " Z & F Assets Realization Corp. v. Hull, 1940, 72 App.D.C. 234, 114 F.2d 464, 470, aff'd 311 U.S. 470, 61 S.Ct. 351, 85 L.Ed. 288. True, the doctrine of separation of powers has been honored in the breach in the delegation of legislative authority to administrative agencies in our complicated modern Government. But the doctrine is still rooted firmly enough in our legal system to withstand cold winters and lukewarm judges.

■ In support of the State's position, the Attorney General of Louisiana argues that the district judge, in receiving applications under the provisions of 42 U.S.C.A. § 1971(e), in holding an ex parte hearing to determine the qualifications of the applicants, in deciding upon those applications and in signing certificates evidencing the fact that certain of the applicants are qualified, is performing an essentially administrative function. The delegation of such function to the courts, the State asserts, is unconstitutional under the decisions of the Supreme Court in United States v. Todd (1794), 54 U.S. 52, 14 L.Ed. 47; United States v. Ferreira (1852), 54 U.S. 39, 14 L.Ed. 42, and Muskrat v. United States (1911), 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246.

The State misconceives what the Act says and what the court does.

39. The Civil Rights Commission proposed a system of federal registrars for federal elections.

290

Subsection (e) comes into effect only after the court issues a judgment in an action brought by the Attorney General of the United States to enforce the rights defined by subsection (a). If the court makes a judicial determination that persons have been deprived of their right to vote in violation of subsection (a), it must, upon application of the Attorney General, make a finding of whether such deprivation was in accordance with a pattern or practice. If the court finds that a pattern or practice exists, the procedures set forth in subsection (e) automatically come into effect. Thereafter, any member of the race found by the court to have been the object of discrimination in the pattern or practice is entitled to apply for an order finding him qualified to vote. The court must enter such order if it finds that the applicant (1) is qualified under state law to vote, and (2) has either been denied an opportunity to register or has been found not qualified by a local official. The statute further provides that the court shall issue to each applicant declared qualified a certificate identifying the holder as a person so qualified.

The statute requires service of notice upon the Attorney General of the State, and upon each of the other parties to the lawsuit, together with an order to show cause why a final order should not be entered declaring the applicants to be qualified in accordance with the court's findings.

We have, therefore, a law-suit in which the court makes legal decisions and renders judgment after passing on issues of fact and law.

 There is no quarrel with the generality that Congress cannot delegate to the courts a purely executive function. Thus, in United States v. Todd, 54 U.S. 52, 14 L.Ed. 47, it was held that Congress could not authorize the courts to receive

and act upon pension applications, and in United States v. Ferreira, 54 U.S. 39, 14 L.Ed. 42 that Congress could not authorize a district judge to make awards under a treaty. But in Section 1971(e) Congress has not so attempted to require the district judge to function as a registrar of voters.

Under Section 1971(e) the court is required to make a determination of the qualifications of any particular applicant only in connection with and as a result of a law-suit filed in court and litigated to judgment. This is a judicial function.

The Supreme Court in Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 adopted the following definition stated by Mr. Justice Miller in his work on the Constitution: " 'Judicial power,' 'is the power of a court to decide and pronounce a judgment and carry it into effect between persons and parties who bring a case before it for decision.' " 219 U.S. at 356, 31 S.Ct. at 253. Subsection 1971(c) authorizes the Attorney General to bring cases before the United States District Courts to enjoin racial discrimination which violates subsection (a) of that section. The court is authorized to render judgment. In subsection (e), Congress has directed how those judgments shall, in the words of Justice Miller, be "carr[ied] into effect."

There is no doubt that before adoption of the 1960 Act a judgment could be rendered against a registrar requiring him to register all qualified persons of the race against whom he had discriminated. See United States v. Raines, 189 F.Supp. 121, 135-136 (M.D.Ga., 1960); Thornton v. Martin, 1 Race Rel.L.R. 213, 217-218 (M.D.Ga., 195£).[40] If the registrar remained adamant, the court, in order to "carry [its judgment] into effect" could add election officials as parties defendant and require them to accept the applicant's ballot on election day.[41] In-

40. For a full discussion of the authority of the court to issue an injunction mandatorily requiring the registration of certain Negroes, rather than simply prohibiting racial discrimination, see Alabama v. United States, 5 Cir., 1962, 304 F.2d

583, aff'd, 1962, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112.

41. For other types of cases where the court, after judgment, has added defendants and granted supplemental relief to

deed, in oral argument the Attorney General of Louisiana, conceded that an order requiring election officials of East Carroll Parish to allow Negroes, found by the court to be qualified, to vote on election day would be a proper exercise of "judicial power" in the constitutional sense. The Act reaches the same result, rather than leaving it to the discretion of the trial judge. This congressional limitation on the court's discretion does not change the court's role from "judicial" to "executive." Congressional directions as to modes and quantum of relief have been frequently sustained. United Steelworkers of America v. United States, 1959, 361 U.S. 39, 80 S.Ct. 1, 4 L.Ed.2d 12 (Labor Management Relations Act); Chattanooga Foundry & Pipe Works v. City of Atlanta, 1906, 203 U.S. 390, 27 S.Ct. 65, 51 L.Ed. 241 (anti-trust); United States v. Wood, 1961, 5 Cir., 295 F.2d 772, 777 (Civil Rights Act of 1957); Henderson v. Burd, 1943, 2 Cir., 133 F.2d 515, 146 A.L.R. 714 (Emergency Price Control Act); Federal Trade Commission v. Rhodes Pharmacal Co., 1951, 7 Cir., 191 F.2d 744 (Federal Trade Commission Act).

The State argues that whatever may be the nature of many of the court's functions under the statute, its action in issuing "to each applicant * * * declared qualified a certificate identifying the holder thereof as a person so qualified," is clearly administrative. This contention confuses the court's certificate with a Louisiana registration certificate. The two are entirely different. The court's certificate has no independent legal significance: it is merely evidence of a judgment in favor of the holder of the certificate in order that the rights established under the judgment will be accorded full acceptance.[42] A certified copy of the court's order would serve the same purpose. The use of certificates in connection with the judicial function as evidence of the acts or orders of a federal court is a common practice. This court issues certificates to attorneys as evidence that they are admitted to practice before the court. The Immigration and Nationality Act specifically provides, in 8 U.S.C.A. § 1449, for the issuance of certificates of naturalization. In Title 28 of the United States Code, section 2253 authorizes judges of this court to issue a "certificate of probable cause" in connection with an appeal from a habeas corpus proceeding, and section 2465 provides for the issuance of a certificate of "reasonable cause" for the seizure of forfeited property. The nature and purpose of the certificate required by section 1971(e) is not essentially different from these other court certificates. The Parish Registrar is not dislodged from office; he continues to function as registrar.

The State objects that the ex parte nature of the initial hearing renders the proceeding essentially administrative. But ex parte proceedings are well established in our jurisprudence.[43] And they

---

make its original order effective, see Labette County Commissioners v. Moulton, 1884, 112 U.S. 217, 5 S.Ct. 108, 28 L.Ed. 698; Natural Gas Pipeline Co. of America v. Federal Power Commission, 7 Cir., 1942, 128 F.2d 481; Faubus v. United States, 8 Cir., 1957, 254 F.2d 797, cert. den'd 358 U.S. 829, 79 S.Ct. 49, 3 L.Ed.2d 68.

42. Testifying on the bill that later became the Civil Rights Act of 1960, Attorney General William P. Rogers explained the voting referee's certificate:
"The voting referee's certifications would be made a part of the court's decree in the original proceeding, and the decree would provide that the persons named are entitled to vote. The decree would be forwarded to the State election officials so that they would be put on notice of the action of the court." Hearings before the Committee on Rules and Administration, U.S. Senate, 86 Cong., 2nd Sess. p. 169.
Again, at page 339, Attorney General Rogers explained, "The certificate will identify the holder as a person entitled to vote at any election covered by the decree."

43. The Act states that in a proceeding before a voting referee, "the applicant shall be heard ex parte at such times and places as the court shall direct". Ex parte proceedings are proper where

are as common in Louisiana as in other states. The State itself, in connection with its "motion and complaint," moved the court, ex parte, for a temporary restraining order. Under section 1971(e), notice must be, and in this case was, given to each party to the law-suit. Both sides are given the right (and it was exercised in this case) to object to the court's interlocutory findings and to present further evidence and argument on both the legal and factual issues.

■■■ B. *The Court's indirect assumption of non-judicial functions through voting referees.* The State attacks the use of voting referees as an inseparable part of the plan by which the court takes over duties which are properly administrative in character.

There is nothing new about the idea of court-appointed judicial officers. Judicial

reliance on masters, referees, and other agents of the court has a long history. The court's use of such representatives is in line with the traditional authority courts of equity exercise. The appointment of federal election supervisors by a district judge has been before the courts and held constitutional. In re Supervisors of Election, 1878, C.C., S.D.Ohio, 23 Fed.Cas.No.13,628.

The office of master in chancery, of French origin and imported with the Norman Conquest,[44] is one of our oldest institutions in Anglo-American law. English Chancery Courts, heavy borrowers from the civil law, may have derived the system of special masters from the civilian judex of the Roman Republic and Early Empire.[45] The civil judex ("referee") was a private citizen appointed by the praetor or other magistrate to hear

the person affected is given an opportunity for an adversary hearing at some stage of the proceeding. Thus, Congress may provide for administrative ex parte fixing of rents if the landlord is given judicial review of the administrative action. Bowles v. Willingham, 1944, 321 U.S. 503, 519-521, 64 S.Ct. 641, 88 L.Ed. 892. Congress may provide for executive seizure of enemy property without hearing where a judicial remedy for a mistaken seizure is later furnished. Stoehr v. Wallace, 255 U.S. 239, 245-246, 41 S.Ct. 293, 65 L.Ed. 604 (1921). So, too, ex parte seizure of misbranded articles in interstate commerce is valid if followed by a judicial hearing. Ewing v. Mytinger and Casselberry, Inc., 1950, 339 U.S. 594, 70 S.Ct. 870, 94 L.Ed. 1088. The United States may collect its internal revenue by summary proceedings where adequate opportunity is afforded for a later judicial determination of the legal rights of the taxpayer. Phillips v. Commissioner, 1931, 283 U.S. 589, 595, 51 S.Ct. 608, 75 L.Ed. 1209. And the Supreme Court has held valid regulations of the Federal Home Loan Board, issued pursuant to the Home Owners' Loan Act of 1933, providing for no hearing until after a conservator had taken possession and control of a savings and loan association. Fahey v. Mallonee, 322 U.S. 245, 253, 67 S.Ct. 1552, 91 L.Ed. 2030. The Interstate Commerce Commission may suspend the operation of a new schedule ex parte pending a hearing. 49 U.S.C. § 15(7). The Federal Com-

munications Commission may do likewise. 47 U.S.C. § 204. Under the Inland Waterways Corporation Act of June 3, 1924, as amended, the Interstate Commerce Commission was authorized to make certain orders ex parte, and, if there was a complaint, then to grant a hearing, the complainant in such hearing to have the burden of proof. In United States v. Illinois Central R. Co., 1934, 291 U.S. 457, 463-464, 54 S.Ct. 471, 473-474, 78 L.Ed. 909, it was held that these provisions were valid, the Court stating "that it was not essential, under the due process of law clause, that a hearing should be held in advance of the initiating order. It is enough that opportunity was given for a full and fair hearing before the order became operative," and, similarly, that the provision "which puts the burden of proof upon the carriers is not inconsistent with the due process clause of the Constitution." In short, the ex parte provision of the Act is not novel and it is not invalid.

44. See 1 Holdsworth, A History of English Law 416, 441-444 (1956); 1 Pollock and Maitland, History of English Law 193 (1959); Bryant, The Office of Master in Chancery: Early English Development, A.B.A.Jour. 498 (1954); Kaufman, Masters in the Federal Courts: Rule 53, 58 Col.L.Rev. 452 (1958).

45. 2 Sherman, Roman Law in the Modern World, Sections 849, 881 (1937).

the evidence, decide the issues, and report to the court appointing him. Whatever its origin, the use of masters was a useful tool of English law before the colonization of America. In the colonial development of America "just as chancery relief had been required and had become a part of the judicial system of colonial America, so had the office of master been recognized as an integral part of the administration of that relief and had become soundly rooted in the legal thinking and custom. It was from this basis that after the Revolution the office of master in chancery or its equivalent made its way into many of the state and federal systems of procedure." [46] In most states today a master in chancery is an assistant of the chancellor. He may perform ministerial or judicial acts, but he "acts as the representative of the chancery court, and his official conduct is subject to the court's control and supervision". 19 Am.Jur. Verbo Equity, 251. "Under the Constitution and statutes of some states, a master has the status of a judicial officer * * * and all the powers of the court in which the cause is pending." 19 Am.Jur. Verbo Equity, p. 253.

Rule 53 of the Federal Rules of Civil Procedure allows a district court to appoint a "standing" master for its district or a "special master". "As used in [the] rules the word 'master' includes a referee, an auditor, and an examiner." Rule 53. A master under Rule 53 has "the duties and obligations of a judicial officer." In re Gilbert, 1928, 276 U.S. 6, 48 S.Ct. 210, 72 L.Ed. 441. Rule 71A allows the appointment of masters and commissioners in eminent domain proceedings.

A Referee in Bankruptcy has even more power than a master: he may render a binding judgment. Pointing out that there is nothing radical about the suggestion that persons other than the trial judge handle some judicial matters, Judge Zavitt observed:

> "There is nothing radical about the suggestion that persons other than the trial judge handle certain details. Referees in Bankruptcy are, in effect, deputy judges, whose determinations are subject to review by the court. Over the years since the Act of 1898, their powers (subject to review) have been extended —with the approval of our judges— have been extended to the point where (since 1938) they have the power to grant or deny discharges— a power formerly reserved to the District Court Judge sitting as a bankruptcy court." Zavitt, The Use of Masters in Aid of the Court, D.C., 22 F.R.D. 283, 285 (1958).

In stockholders' suits to compel the holding of corporate elections, illegally delayed by corporate officers, courts have appointed masters to conduct the elections. Bartlett v. Gates, 118 F. 66 (C.C. Colo., 1902); Burnett v. Banks, 130 Cal. App.2d 631, 279 P.2d 579 (1955); Fein v. Lanston Monotype Machine Co., 196 Va. 753, 85 S.E.2d 353 (1955). In suits by a remainderman, where the life tenant has failed to carry out his duties, a court may appoint an officer to manage the estate, Restatement of Property, Ch. 13 § 189(f); Keeley v. Clark, 125 Misc. 541, 211 N.Y.S. 391 (1925). Upon failure of a party to comply with an order to convey land or deliver deeds or "to perform any other specific act," federal courts are authorized to appoint a third person to perform the act (Rule 70, Fed.R.Civ.P.). In a suit to protect the rights of union members the court has appointed a Board of Monitors to review and report to the court on the management of the union. English v. Cunningham, 106 U.S.App.D. C. 70, 269 F.2d 517, modified 106 U.S. App.D.C. 92, 269 F.2d 539 (1959), cert. denied, 361 U.S. 897, 80 S.Ct. 195, 4 L.Ed.2d 152. In suits for abatement of

---

46. Bryant, The Office of Master in Chancery: Colonial Development, 40 A.B.A.Jour. 595 (1954).

a nuisance, courts have directed an officer of the court to engage a contractor specifically to abate the nuisance. Clarke v. Chicago B. & Q. R. Co., 62 F.2d 440 (C.A. 10, 1933). In a suit for specific performance of a contract for the transportation of personal property, a court has appointed a receiver to take possession of the property and deliver it to the plaintiff. Madden v. Rosseter, 114 Misc. 416, 187 N.Y.S. 462 (1921). See also, In re Utilities Power and Light Corp., 90 F. 2d 798 (C.A. 7, 1937), certiorari denied, Associated Investing Corp. v. Utilities Power & Light Corp., 302 U.S. 742, 58 S.Ct. 144, 82 L.Ed. 543; In re Joslyn's Estate, 171 F.2d 159 (C.A. 7, 1949); Bair v. Bank of America Nat. Trust & Savings Ass'n, 112 F.2d 247 (C.A. 9, 1940), certiorari denied, 311 U.S. 684, 61 S.Ct. 61, 85 L.Ed. 441; DuPont v. DuPont, 242 F. 98, 137–138 (D.Del.1917), certiorari denied, 250 U.S. 642, 39 S.Ct. 492, 63 L.Ed. 1185; and Bartlett v. Gates, 118 F. 66 (D.Colo.1902).

Going to the Act, we see that the Referee functions under the close supervision of the appointing court. The referee receives applications, takes evidence, and makes findings that must be reported to the court for action. A copy of the report is forwarded to the State attorney general with an order to show cause why *the court* should not enter an order in accordance with the report. The attorney general may except as to matters of fact or law. "The issues of fact and law raised by such exceptions *shall be determined by the court* or, if the due and speedy administration of justice requires, they may be referred to the voting referee to determine *in accordance with procedures prescribed by the court.*"

(Emphasis supplied). A voting referee is given "all the powers conferred upon a master by rule 53(c)."

On the face of the act, we cannot say that the court, acting through a voting referee, takes over the non-judicial functions of a state registrar. The court, not the referee, on the basis of the referee's findings, determines whether an applicant, "qualified to vote under State law" is denied that right.

## IV.

### Finding of a Pattern of Discrimination Not a "Case or Controversy."

██ The defendants contend that the voting referee procedure established in Title VI is unconstitutional because it imposes on a court the obligation to make a finding or decision as to a discriminatory "pattern or practice" that has no relation to the "case" or "controversy" before the court. Under Article III, Section 2 of the Constitution courts are limited to deciding cases and controversies. The argument is that the proceeding set up in Title VI is not an adversary proceeding (no aggrieved Negro voters are named); that there is no justiciable issue; that there is no controversy appropriate for judicial determination, and, that the obligation imposed on the court of making a finding of a discriminatory pattern has nothing to do with the original finding that particular persons had been deprived of their voting rights. This argument rests on a misconception of a suit under the Civil Rights Acts. The controversy is not between certain aggrieved Negroes and the defendants. The controversy is between the United States and the named defendants.[47]

---

47. The elimination of proof of specific discrimination against every aggrieved Negro voter is the same kind of relief often accorded by courts of equity in cases brought to vindicate a public interest: the statute permits extension of the protection of a court decree to all persons of a group injured by illegal acts of the defendants. In suits involving the public interest, equity provides numerous examples of decrees which afford protection far beyond the redress of the particular wrongdoing which has been litigated. "Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." Virginia R. Co. v. System Federation, 1937, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789; see also Yakus v. United States, 1944,

Section 2 of the Fifteenth Amendment expressly authorizes Congress to enact legislation to prevent denial of voting rights on account of race or color. In accordance with this Section, and in recognition of the public interest in enforcement of the Amendment, the Civil Rights Act of 1957 authorizes the United States, in its capacity as "the guardian of that public interest", as it is characterized in Raines, to bring an action as plaintiff to prevent racial discrimination in voting. Suit is brought "for the United States, or in the name of the United States". It is a suit not just to vindicate the constitutional rights of particular individuals as to whom evidence is presented but to vindicate the public interest in the constitutional right of all citizens to be free from racial discrimination in exercising voting rights. cf. International Salt Co. v. United States, 1947, 332 U.S. 392, 401, 68 S.Ct. 12, 92 L.Ed. 20. Title VI of the 1960 Act provides equitable remedies to make such a suit effective. The issues are, first, whether the defendants deprived particular persons of their right to vote, and second, whether this was pursuant to a "pattern or practice". We have before us, therefore, a case or controversy with real adversaries and with issues that are properly determinable by a court. The fact that the particular aggrieved voters are not named and that, after a finding of discrimination, or along with it, the court may make another finding that the discrimination was according to a pattern is in keeping with the theory of the Act that the real aggrieved party in the "case" or "controversy" is the United States of America.

A hundred years ago in ordeal by battle this nation settled forever the issue of interposition. The reality of national sovereignty prevailed over metaphysical state sovereignty. At this late date the continued assertion of the misguided doctrine of interposition in one form or another, in various kinds of litigation, only confuses the public without benefiting the litigant or aiding bona fide States' Rights.

The United States occupies the same Louisiana land as the State of Louisiana. It has an equal interest with the State or greater interest than the State in many of the same things. The federal government, for example, has a manifestly valid

321 U.S. 414, 442, 64 S.Ct. 660, 88 L.Ed. 834; and Porter v. Warner Holding Co., 1946, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332.

The antitrust field in particular provides significant parallels. In that area, as here, suits are brought by the United States to vindicate a public interest, and the decrees in those cases are fashioned accordingly. In United States v. Bausch & Lomb Co., 1944, 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024, the Court found that the defendant had established an illegal system of retail price maintenance. The Court invalidated all its price maintenance agreements, even those which were lawful. Similarly, under the instant statute, once a pattern of discrimination has been found, the defendants' authority over *all* threatened victims of the pattern must be scrutinized by the court in order, as was said in Bausch & Lomb, 321 U.S. 724, 64 S.Ct. 812, "that the ground may be cleansed effectually from the vice of the former illegality. Equity has power to eradicate the evils of a condemned scheme by prohibition of the use of admittedly valid parts of an invalid whole." In International Salt Co. v. United States, 1947, 332 U.S. 392, 401, 68 S.Ct. 12, 17, 92 L.Ed. 20, the Court said: "In an equity suit, the end to be served is not punishment of past transgression, nor is it merely to end specific illegal practices. A public interest served by such civil suits is that they effectively pry open to competition a market that has been closed by the defendants' illegal restraints. If this decree accomplishes less than that, the Government has won a lawsuit and lost a cause." In International Salt the Court ordered the defendant to make its unique machine available "to any applicant" and not merely to those who had been victims of the defendant's previous illegal agreements. Cf. also United States v. U. S. Gypsum Co., 1950, 340 U.S. 76, 71 S.Ct. 160, 95 L.Ed. 89. The voting referee provision operates in a precisely parallel fashion in extending the protection of the court's decree to all members of the group threatened by the defendants' conduct.

**296**

interest in the integrity of the electoral process from registration office to polling booth. The State may have the primary responsibility for conducting elections, but if a State shirks this responsibility, or uses its power to deny the right of qualified electors to vote, it must expect the Nation to honor the obligation the State has evaded.

The non-existence of the doctrine of interposition and the recognition of the paramount sovereignty of the nation are not in conflict with a fair and practicable federal union in which States' Rights are exercised, virtually free from any federal judicial control, in political self-determination, economic regulation, and other vast areas of governmental activity. The words of Justice Bradley, in Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717, are meaningful today:

> "There is no such conflict between [the regulations of the State and those of Congress] as to prevent their forming a harmonious system perfectly capable of being administered and carried out as such. * * Where there is a disposition to act harmoniously, there is no danger of disturbance between those who have different duties to perform. When the rightful authority of the General Government is once conceded and acquiesced in, the apprehended difficulties will disappear. Let a spirit of national as well as local patriotism once prevail; let unfounded jealousies cease, and we shall hear no more about the impossibility of harmonious action between the National and State Governments in a matter in which they have a mutual interest. * * * The true interest of the people of this country requires that both the National and State Governments should be allowed, without jealous interference on either side, to exercise all the powers which respectively belong to them according to a fair and practical construction of the Constitution. State rights and the rights of the United States should be equally respected. Both are essential to the preservation of our liberties and the perpetuity of our institutions. But, in endeavoring to vindicate the one, we should not allow our zeal to nullify or impair the other."

For the foregoing reasons the complaint of the State of Louisiana is dismissed and its motion for an injunction denied.